423 So.2d 800 (1982)
Dennis McQUEEN, Sr.
v.
STATE of Mississippi.
No. 53142.
Supreme Court of Mississippi.
September 22, 1982.
Cook, Tucker & Sharp, James G. Tucker, III, Bay St. Louis, for appellant.
Bill Allain, Atty. Gen. by Wayne Snuggs, Asst. Atty. Gen., Jackson, for appellee.
SUGG, Presiding Justice, for the Court:

ON PETITION FOR REHEARING
Appellant's conviction of forcible rape was affirmed by a panel of three justices. However, on petition for rehearing a majority of the justices have concluded that the evidence was not sufficient to prove appellant forcibly raped the prosecutrix. Accordingly, the original opinion is withdrawn and this opinion is substituted therefor.
Appellant has assigned seven errors, but because we are reversing on the sufficiency of the evidence, we do not address the remaining assignments of error.
The prosecutrix was a fourteen year old unmarried female and was visiting her sister, Elizabeth McQueen, who had recently moved to Picayune. Elizabeth McQueen and appellant were husband and wife but had recently separated in New Orleans. On the date in question appellant brought some furniture from New Orleans to Picayune, and after he unloaded the furniture asked if he could take the baby for a ride. The baby was the two year old child of the appellant and Elizabeth McQueen. Elizabeth McQueen did not want the baby to accompany appellant alone so she requested that prosecutrix accompany them. Appellant, the prosecutrix and the baby left in appellant's pickup, and Mrs. McQueen testified that when they returned the prosecutrix was acting strange, started to cry, and was shaking. She stated that appellant stayed only about fifteen or twenty minutes and after he left the prosecutrix told her that appellant made her have sex with him. The prosecutrix was called as a witness and was asked to tell what happened while they were absent from the house. The prosecutrix testified as follows:
Okay, Dennis McQueen had come over Wednesday, and he was there for a little while, and he said he had to go to the store, and he asked if the baby could go *801 with him, and the baby started crying, so Elizabeth asked me if I would go to keep an eye on the baby. So I went, and we went to Bill's Store, and we got some coke, and we was leaving from the store, and he said he was lost, and he brought me back on this road, and he said he had to use the bathroom, and he turned the truck around, and he turned off the lights, and I locked my side of the door, and he come around on my side and told me to get out, so I did. He told me to take off my clothes, but leave one leg on, and I was scared, and I told him that I wanted to go home. So he told me to go around on the other side and lay on the driver's seat side and lay half way. So I did, and he told me to put my legs up on his shoulders and I did, and I was crying, and he made the baby sit on the other side of the truck, on the passenger's side, and he told me that he wasn't going to hurt me, and it wasn't going to take long, and while we was doing it and that, he told that, I've got news for you, it's in, and I started crying and I told him that I wouldn't  that I didn't want to get pregnant, and he told me that he wasn't going to come inside me, and so after he was finished, he told me, he says not to say anything to Tootie that he would do all the talking. When we got home, Tootie was on the  Elizabeth was on the porch, and she asked what took us so long, and he said that the baby wanted to go riding around. So we went and sat inside of the house, and I was crying and trying to tell Tootie  Elizabeth what happened, and he was sitting there nervous and that, and the baby had said, Janie  well, at the last part, he said, "Janie was playing with daddy's worm," and then he tried to change the subject, and after that he left, and then after that, I told my sister what happened, and she went  we went to the Police Station and gave my statement and that, and then we went to the hospital, and then we went back to the Police Station, and then we went  I went and showed the Police Officer the road where Dennis McQueen had took me.
On direct examination the prosecutrix stated that the door on the driver's side of the pickup was open. She said that the appellant asked her to open the door on the passenger's side to which she responded, "No." When he asked her a second time she opened the door. She stated his tone of voice was "very heavy like." She was then asked "Did he say that he was going to do anything to you?" The witness responded "No, sir." She then related that after she got out of the pickup appellant told her to go around on the other side and take her underclothes and shorts off and leave one leg on. She also testified that the baby was talking and moving around in the truck while the incident occurred. On cross-examination she testified that she was scared of appellant and when asked why, answered, "I was just scared of him because he was drinking and that, and I was scared he was going to hurt me."
On direct examination the prosecutrix stated that she told the appellant that she was afraid she was going to get pregnant. The following questions and answers then occurred:
Q. Who had told you that?
A. My mother.
Q. So what were your exact words? What did you tell him at that time?
A. I told him I didn't want to get pregnant, and I was scared.
Q. And what did he say?
A. And he said it wouldn't hurt, and it would only take a little while, and he would not get me pregnant.
Q. And then what happened?
A. Then he put his penis in, and I was crying and telling him that it hurt, and that I wanted to go home, and he wouldn't let me get up.
Q. Did you know where the baby was at this time?
A. The baby was on the passenger's side of the truck.
The witness was asked on cross-examination to describe what she meant by force and her answer was as follows: "Well, the tone of his voice and that, for first of all. Okay, second of all, by not letting me get *802 up when I wanted to, when I wanted to stop and just by making me do something that went against my will."
On redirect examination the prosecutrix was asked what the appellant said to make her take her clothes off and her answer was, "All he said was, take your clothes off," and I did. She was then asked if she knew what he wanted to do at that time and she replied that when he told her to take her clothes off, "Well, I knew what he had in mind to do."
The prosecutrix was examined by a doctor shortly after the incident complained of. The doctor testified that the prosecutrix said no force was used and he could not determine if there had been penetration. The only evidence of trauma was a reddening of the vulva which the doctor said could have been caused by manipulation of the genitals by oneself or by another individual, tight fitting clothes, or wearing Kotex.
Appellant testified that he, the prosecutrix, and his young son went to a store where he purchased a root beer, a coke and two bottles of Miller beer. He stated that they drove back to the house and were gone approximately twenty to twenty-five minutes. He denied that he stopped the truck between the store and the house and denied that he had sex relations with the prosecutrix. He stated that the prosecutrix wanted to drive the truck but he refused because it was a company truck. He stated that the prosecutrix grabbed "his private, and she was trying to entice me to let her drive the truck." He stated the prosecutrix got angry because he would not let her drive the truck and did not say another word on the ride back to the house. He said when he arrived at the house he played with his son, drank one of the beers and then left to return to New Orleans.
Appellant was indicted for forcible rape in violation of section 97-3-65(2) Mississippi Code Annotated (Supp. 1979). Appellant's principal argument is that there was no evidence that any force was used, no weapon was exhibited, no physical struggle ensued, and no threats were made by appellant. He also argues there was no evidence that prosecutrix yielded without a reasonable apprehension of great bodily harm being done to her.
In Rush v. State, 301 So.2d 297 (Miss. 1974), we stated:
We have held in numerous cases that physical resistance is not required where the female yielded through fear under a reasonable apprehension of great bodily harm. Fields v. State, 293 So.2d 430 (Miss. 1974); Johnson v. State, 223 Miss. 56, 76 So.2d 841 (1955). If the female fails to resist the attack of her assailant because she is put in such apprehension and fear, the act of the assailant may be rape under the law. Fields, supra; McGee v. State, 40 So.2d 160 (Miss. 1949), cert. denied, 338 U.S. 805, 70 S.Ct. 77, 94 L.Ed. 1369 (1950); Milton v. State, 142 Miss. 364, 107 So. 423 (1926).
In the cases cited, there were verbal threats and the exhibition of a knife or gun. In the instant case, the appellant did not make any verbal threats or utterances of any kind nor did he exhibit a deadly weapon. However, the testimony is undisputed that appellant grabbed the victim by the throat, dragged her into the adjoining room and forced her to the floor placing the weight of his body upon her. The extent of the force and pressure upon her throat is reflected in the prosecutrix's testimony that: "I couldn't breathe and I was gagging and it kinda made me groggy."
In describing the fear that she experienced at the time, the prosecutrix said:
I couldn't do anything. I was so scared. It was just like I was frozen. I couldn't raise my arms or anything. I was just like I was paralyzed. I couldn't move.
Well, he was  it was like a dead weight on top of me and then all I could think of I didn't want to get him angry. I was scared he might hurt my baby or me, to make me cooperate, and I just wanted him just to go away and leave us alone. (301 So.2d at 299)
In the case before the Court the testimony for the state establishes that appellant is *803 28 years of age, he had been drinking beer, he stopped at a secluded spot at night, appellant stated he was lost, removed the ignition key thus immobilizing the truck, made his desire known to the prosecutrix who had locked the door on her side of the car, and in a "heavy" tone of voice, commanded her to remove her clothing and lie down on the seat after which appellant had sexual intercourse with her.
The evidence for the state not only fails to satisfy the mind of the guilt of the accused but suggests grave doubt of it. No bruises or marks of violence were evident except reddening of the vulva. No weapon was exhibited and the evidence falls far short of showing that the prosecutrix submitted because of a reasonable apprehension that she would suffer injury if she refused. Appellant did not threaten to injure prosecutrix, did not forcibly remove her from the truck, did not remove her clothes, and did not forcibly make her lie down in the truck. The evidence presented on behalf of the state is legally insufficient to support a conviction for the crime of forcible rape.
The United States Supreme Court in Burks v. State, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) and Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978) held that cases reversed by a reviewing court because the evidence is legally insufficient to support conviction bars a retrial under the double jeopardy clause of the Fifth Amendment to the United States Constitution. In Tibbs v. Florida, ___ U.S. ___, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) the Court held that a reversal by an appellate court on the ground that the verdict of the jury was against the weight of the evidence did not preclude a retrial of the defendant. Tibbs clearly distinguished between cases reversed because the evidence was legally insufficient to support a conviction and cases reversed because the verdict was against the weight of the evidence. The Court stated:

Burks v. United States and Greene v. Massey carved a narrow exception from the understanding that a defendant who successfully appeals a conviction is subject to retrial. In those cases, we held that the Double Jeopardy Clause precludes retrial "once the reviewing court has found the evidence legally insufficient" to support conviction. Burks, supra, [437 U.S.] at 18 [98 S.Ct. at 2150]; Greene, supra [437 U.S.] at 24 [98 S.Ct. at 2154]. This standard, we explained, "means that the government's case was so lacking that it should not have even been submitted to the jury." Burks, supra [437 U.S.] at 16 [98 S.Ct. at 2149] (emphasis original). A conviction will survive review, we suggested, whenever "the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt." Ibid. See also Greene, supra [437 U.S.] at 25 [98 S.Ct. at 2154]. In sum, we noted that the rule barring retrial would be "confined to cases where the prosecution's failure is clear." Burks, supra [437 U.S.] at 17 [98 S.Ct. at 2150].
... .
As we suggested last Term, these policies do not have the same force when a judge disagrees with a jury's resolution of conflicting evidence and concludes that a guilty verdict is against the weight of the evidence. See Hudson v. Louisiana, 450 U.S. 40, 44-45 n. 5 [101 S.Ct. 970, 972-973 n. 5, 67 L.Ed.2d 30] (1981). A reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the appellate court sits as a "thirteenth juror" and disagrees with the jury's resolution of the conflicting testimony. This difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves. A deadlocked jury, we consistently have recognized, does not result in an acquittal barring retrial under the Double Jeopardy Clause. Similarly, an appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal.

*804 A reversal based on the weight of the evidence, moreover, can occur only after the State both has presented sufficient evidence to support conviction and has persuaded the jury to convict. The reversal simply affords the defendant a second opportunity to seek a favorable judgment. An appellate court's decision to give the defendant his second chance does not create "an unacceptably high risk that the Government, with its superior resources, [will] wear down [the] defendant" and obtain conviction solely through its persistence. United States v. DiFrancesco, supra, [449 U.S. 117] at 130 [101 S.Ct. 426 at 433, 66 L.Ed.2d 328].
While an appellate ruling based on the weight of the evidence thus fails to implicate the policies supporting Burks and Greene, it does involve the usual principles permitting retrial after a defendant's successful appeal. Just as the Double Jeopardy Clause does not require society to pay the high price of freeing every defendant whose first trial was tainted by prosecutorial error, it should not exact the price of immunity for every defendant who persuades an appellate panel to overturn an error-free conviction and give him a second chance at acquittal. Giving the defendant this second opportunity, when the evidence is sufficient to support the first verdict, hardly amounts to "governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect." United States v. Scott, 437 U.S. 82, 91 [98 S.Ct. 2187, 2193, 57 L.Ed.2d 65] (1978).
Petitioner Tibbs resists these arguments on the grounds that a distinction between the weight and the sufficiency of the evidence is unworkable and that such a distinction will undermine the Burks rule by encouraging appellate judges to base reversals on the weight, rather than the sufficiency, of the evidence. We find these arguments unpersuasive for two reasons. First, trial and appellate judges commonly distinguish between the weight and the sufficiency of the evidence. We have no reason to believe that today's decision will erode the demonstrated ability of judges to distinguish legally insufficient evidence from evidence that rationally supports a verdict.
Second, our decision in Jackson v. Virginia, 443 U.S. 307 [99 S.Ct. 2781, 61 L.Ed.2d 560] (1979), places some restraints on the power of appellate courts to mask reversals based on legally insufficient evidence as reversals grounded on the weight of the evidence. We held in Jackson that the Due Process Clause forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt. The Due Process Clause, in other words, sets a lower limit on an appellate court's definition of evidentiary sufficiency. This limit, together with our belief that state appellate judges faithfully honor their obligations to enforce applicable state and federal laws, persuades us that today's ruling will not undermind Burks. In sum, we conclude that the Double Jeopardy Clause does not prevent an appellate court from granting a convicted defendant an opportunity to seek acquittal through a new trial. (___ U.S. at ___, 102 S.Ct. at 2217-19, 20; 72 L.Ed.2d at 660-63)
We base the reversal on the fact that the evidence in this case was legally insufficient to support a conviction and not on the weight of the evidence. Therefore, we reverse and discharge appellant under the authority of Burks and Greene, supra.
REVERSED AND APPELLANT DISCHARGED.
PATTERSON, C.J., WALKER, P.J., and BOWLING and PRATHER, JJ., concur.
DAN M. LEE, J., concurs in part and dissents in part.
BROOM, HAWKINS and ROY NOBLE LEE, JJ., dissent.
DAN M. LEE, Justice, concurring in part and dissenting in part:
I agree with the majority that this case should be reversed because the state's proof *805 was legally insufficient to support a conviction for the crime of forcible rape. I also agree that the case should be reversed because the trial judge erred in refusing to permit the pretrial inspection by defense counsel of written statements given by the prosecutrix to the investigating officers, and to cross-examine her with regard to those statements. However, I would not reverse and discharge appellant for the following reasons.
Although the evidence was insufficient to sustain a conviction for forcible rape and therefore appellant's retrial on that charge is barred by the double jeopardy clause pursuant to Burks v. State, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), appellant might still be indicted and tried for the crime of statutory rape.[1]
Force is not an element of the crime of statutory rape, the gist of the offense being the prosecutrix's inability to consent to the act. Brooks v. State, 242 So.2d 865 (Miss. 1971). The prosecutrix in the present case was fourteen years of age. The absence of force in the act itself would not preclude a conviction of statutory rape. I would reverse appellant's conviction for forcible rape, which would not preclude presentation of the matter to a grand jury on a charge of statutory rape.
BROOM, Justice, dissenting:
Insufficiency of evidence is the main ground upon which the majority, upon petition for a rehearing, is now going to reverse a criminal conviction based upon a unanimous jury verdict. The majority opinion by Presiding Justice Sugg states that previously a "panel of three justices affirmed" the conviction.[1] Because of my great respect for the opinions of my colleagues, I am reluctant to disagree with them. With much deference, my dissent is proper here because sufficient evidence was introduced to make out a jury issue on the indictment.
In making a logical analysis of this case, we must start out with the proposition that, in passing upon the sufficiency of the evidence, the lower court (and this Court) is required to accept as true all of the evidence that is favorable to the state, including reasonable inferences which may be drawn from such evidence, and to disregard evidence favorable to the defendant. If the evidence, judged in this manner, was sufficient to convince a rational factfinder of the defendant's guilt beyond a reasonable doubt, the trial judge correctly ruled that the proof of guilt was adequate. Bullock v. State, 391 So.2d 601 (Miss. 1980); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 1781, 61 L.Ed.2d 560 (1979).
As Justice Bowling recently stated in Griffin v. State, 381 So.2d 155 (Miss. 1980), a rape case: "We do not sit as jurors. That fact-finding body, while being overseen by the trial court, has the constitutional duty to decide which witnesses are relating an accurate account of the occurrences giving rise to the trial." Id. at 157.
Mindful of the foregoing, the evidence before us is subject to analysis. The prosecutrix testified without equivocation that the appellant "put his penis in me" and that she knew so  "it hurt." When she arrived back home and reported the incident to Mrs. McQueen, according to Mrs. McQueen's testimony, the prosecutrix "was really acting strange ... she started to cry, and she was shaking ... she was really upset." Promptly the prosecutrix then reported the matter to the police. We must further discern from the testimony whether the sexual intercourse occurred "against the will" of the victim or "without [her] consent", which is an element of common law rape and has been stated by us to be an element under § 97-3-65(2). Wilson v. State, 221 So.2d 100 (Miss. 1969).
Positive testimony of the prosecutrix was that she did not voluntarily engage in sexual *806 intercourse with appellant, but that she was "forced" to do it. Clearly a forcible rape conviction can be upheld absent literal physical resistance where (as here) resistance would be futile or where the victim is overcome by superior strength or fear arising out of a reasonable apprehension of great bodily harm. Rush v. State, 301 So.2d 297 (Miss. 1974); Rusk v. State, 289 Md. 230, 424 A.2d 720 (1981) and Tryon v. State, 567 P.2d 290 (Wyo. 1977).
Otis v. State, 418 So.2d 65 (Miss. 1982)[2] decided by this Court 1982, but not yet reported, is a recent rape case wherein this Court, without dissent, held that weaker evidence than that in the instant case was sufficient to support a forcible rape conviction. There a fifteen-year-old student who had "an IQ of 77 or 78 and the mentality of about an 11-year old" testified that her special education teacher forcibly raped her in the teacher's restroom while they were both in a standing posture. No weapon was involved. No serious threat was expressed by the teacher. There the prosecutrix made no report of the incident until five (5) weeks later, and then only in response to questioning by the school principal. There we held the evidence sufficient but now the majority says not so, even though in the present case the prosecutrix went home crying, promptly went to the police (nervous and upset) and the doctor. Subsequently she testified that her intercourse with McQueen was submitted to out of fear, that he forced her, and hurt her against her will. Otis cannot be reconciled to the majority decision in the instant case.
My view is that the jury in this case could have reasonably concluded that McQueen's actions and conduct were reasonably intended by him to induce fear of serious bodily harm in the mind of prosecutrix if she did not submit to him. Pretending to be lost, he drove to a remote area where there were no other people, no lights, and the nearest house was blocks away. He immobilized the truck by removing the ignition key and immediately made his intentions known by partially removing his pants and underwear. When the prosecutrix locked the door on her side of the truck, McQueen demanded in a heavy tone of voice that she open it. He then demanded that she remove her clothes, lie down on the seat, place her legs over his shoulders, and in that context he had sexual intercourse with her.
With the foregoing testimony before it, the jury reasonably could have concluded that the prosecutrix was placed in reasonable fear of bodily harm by defendant McQueen's actions and conduct. He was a 28-year-old male and she was 1/2 his age. She knew that he had been drinking. Further she was afraid of him because of the following: his tone of voice, his actions, and because of what he had done in the past. Her testimony given the jury was that she "knew what he had in mind to do" when he told her to remove her clothes. She was in a remote area where there were no people to hear her screams for help; she was afraid that he would hurt her; and, although she did cry, it was to no avail.
After long and careful study, I have concluded that we should not require the victim of forcible rape to do more than her age, strength, surrounding facts and all attending circumstances made it reasonable for her to do in order to manifest opposition or lack of consent. The jury could have reasonably found that under the circumstances with which she was confronted it was reasonable that she, a thirteen-year-old child, would be terrified of the older (double her age) and obviously physically superior male, and that his threatening conduct and actions in her mind were as real as if he had actually threatened to kill her with a deadly weapon. Therefore, as the jury found, she was justified in failing to jeopardize her life and safety by physically resisting. It is lamentable but true that too many times cases have come before this Court showing that where a rape victim kicked, screamed, and physically fought to the bitter end  she became victim of a homicide following a rape. I am simply unwilling to hold that a *807 young girl, faced with the circumstances which confronted the prosecutrix in this case, was required to actually and literally physically resist in order for the rape conviction to be upheld. Obviously and beyond question such resistance would have been without success and very well may have resulted in some worse disaster.
The Court, including my two brethren who with this writer sat on the original panel, is making a flip-flop on a fact issue which was fully developed at oral argument, the original opinion, and in the original briefs. Not only that, the defendant is being discharged. I am unable to recall a prior case in which a criminal conviction was affirmed by this Court without a dissent, and then (on petition for rehearing) upon a fact issue reversed and rendered.
Unable to agree with the majority decision, I register this dissent.
ROY NOBLE LEE and HAWKINS, JJ., join in this dissent.
HAWKINS, Justice, joining in Justice BROOM'S dissent:
As judges we search for human reality. We must always be finely attuned so as to perceive it, regardless of the infinite variety or myriad forms by which it might display itself before us. Any experienced judge or trial lawyer will quickly attest that truth can come in many subtle forms and shapes.
In my view, Justice Broom has recognized the reality of fear and terror in a child's mind which can reasonably and rationally transpire when accosted by a grown man in a strange, dark, secluded and lonely place, a fright fortified by the knowledge of the man's character and the fact that he was drinking.
Do we as an appellate court have the right to require more resistance from a victim, or more threat of violence from the accused than was shown in this case?
Must the victim be mangled, or see a deadly weapon, or have to hear actual utterance of specifically threatening words before we can authorize a jury to discern rational fear of violence? If we make these criteria absolutes, we ignore reality.
I believe there was sufficient evidence to support the jury verdict.
I do think this case should be reversed and remanded, but for an entirely different reason. In my view, the trial judge erred in refusing to permit the pretrial inspection by defense counsel of written statements given by the prosecutrix to the investigating officers, and to cross-examine her with regard to those statements.
I would not reverse and render this case on the insufficiency of the evidence, but would reverse and remand for another trial on this one error of refusal to grant pretrial inspection.
NOTES
[1] Miss. Code Ann. § 97-3-65(1) (Supp. 1979).
[1] Actually the opinion had the concurrence of the entire Court, except that Dan Lee, J., did not participate. The case originally was orally argued before the writer of this dissent, sitting with Sugg, P.J., and Bowling, J.
[2] Otis was reversed on other grounds.