RUSSELL, J.,
 

 for the Court:
 

 ¶ 1. Roland Harris was convicted of manslaughter and an enhancement for using a firearm. He appeals, asserting three issues: (1) whether the jury should have been given a jury instruction on excusable homicide; (2) whether the circuit court erred in failing to grant a directed verdict based on the rule announced in
 
 Weathers-by;
 

 [1]
 

 and (8) whether the jury’s verdicts were contrary to the overwhelming weight of the evidence. Upon review, we find no error. Therefore, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. At around 8:80 a.m. on April 24, 2010, Edward Jones (aka “Tweety Bird”) was on his way home from a nightclub on foot when he saw his friend, Roy Jackson (aka “Quick”), lying in the street in a pool of blood. Jones immediately called the Greenville Police Department, and several officers and investigators arrived on the scene shortly thereafter.
 

 ¶ 3. Officers discovered a shell casing about ten feet from Jackson’s body, and the casing was taken into evidence. According to firearm expert Starks Hath-cock, the projectile was consistent with a .40 caliber. An ambulance arrived at some point, and the EMT pronounced Jackson dead on the scene. Subsequently, the coroner took custody of Jackson’s body. An autopsy later revealed that a gunshot wound to the neck was the cause of death, and the manner of death was ruled a homicide.
 

 ¶ 4. Jones told police that he went out that evening to Southern Whispers and Spotlite, both nightclubs, and that he had just seen Jackson hours prior at Spotlite with Jeannette Thurman and Harris. Jones stated he saw Jackson in the front seat and Thurman in the back seat of a tan Tahoe outside Spotlite earlier that night. According to Jones, Jackson appeared happy when the two spoke earlier that evening, and Jones did not observe any altercation or confrontation between Jackson and any other person.
 

 ¶ 5. Lillie Jordan lived in the house next to the street where Jackson’s body was discovered. She testified that she was sleeping when she awoke to the sound of some men talking outside. Jordan also heard a gunshot and a car speed away. About five to ten minutes later, she heard several cars outside of her home and saw policemen in the street. Therefore, she went outside, where she saw a man lying in the street.
 

 ¶ 6. Thurman testified that she was at the home of James Jackson (aka “Jack”) on April 23, 2010 at around 10:00 p.m. with several friends, including Jackson, playing cards, dancing, singing, and drinking beer and gin that night. At some point, Jackson left the house and returned with Harris in a tan Tahoe. Upon their arrival, Thurman got into the Tahoe with Jackson and Harris and “went riding.” Jackson already had some alcohol (Ciroc) in the vehicle, so they stopped for cups and ice. According to Thurman, everyone filled his or her cup with alcohol and they rode around together. Next, they made a restroom stop on the side of the road, and then
 
 *303
 
 Harris drove to Spotlite so Thurman could use the lady’s room. They drove around some more, and eventually made another stop at Spotlite to purchase a half-pint of gin, and all three drank the half-pint while riding around town. During this second stop at the Spotlite, Thurman testified that Harris and Jackson may have gone somewhere because she had to wait for them to come pick her back up. Thurman stated she saw Jones outside the Spotlite both times they stopped there that evening. Once Harris and Jackson picked Thurman up from the Spotlite, they drove around again.
 

 ¶ 7. The next stop they made was when Thurman heard the gunshot. Right before the shooting, Thurman testified that she heard Harris and Jackson whispering to each other, but she could not hear what they were saying because the music was loud. Thurman was texting on her cell phone when she heard the gunshot. Therefore, she did not see what Jackson was doing, and she did not see Jackson open the door to the Tahoe. After the gun went off, she looked up and Harris was looking at her. She testified that she was thinking she was “about to die” because she was in a “bad situation.” Neither Thurman nor Harris got out of the vehicle. Instead, Harris drove off with the passenger door open, and the door closed when he turned a corner. Thurman and Harris proceeded to a hotel called the Raceway Inn, where they stayed the night. Neither slept. Thurman stated that Harris was pacing back and forth, saying he was sorry.
 

 ¶ 8. At daylight, Harris took Thurman back to Jack’s house. Thurman met her friend Vickie, and they drove around drinking beer. Vickie finally took Thurman home, where she was met by several detectives and police officers. Thurman voluntarily went to the police station and gave a statement at about 2:00 p.m.
 

 ¶ 9. Sergeant Delando Wilson and Sergeant Michael Merchant questioned Harris on April 25, 2010 at approximately 1:40 p.m. after reading Harris his
 
 Miranda
 
 rights and obtaining a waiver of the same. Relevant portions of the interview are as follows:
 

 Q: Ok. Mr. Harris, you know we are here talking to you about an incident that occurred on the morning of April 24, 2010, where you and Roy Jackson were together. Now, can you tell me what happened prior to the incident, and up to the incident?
 

 A: Uh we were riding and drinking. We was all having a good time actually and uh went down Nelson [and] got a few bottles, a few drinks I mean, or whatever and we riding and drinking and all [and] something came up missing in the truck so we were looking for it and uh kind of ended the night so I was, we were planning on going back to the neighborhood and you know, go different ways or whatever, but on the way down, on the way back home, pulled over for Roy to use the restroom (inaudible) [and] we was about to find what we were looking for, happened to have a weapon in my hand when he was getting out the car and that was it, went off.
 

 Q: The gun went off?
 

 A: Yeah.
 

 Q: What kind of gun was it?
 

 A: A 40 uh 45 (inaudible)
 

 Q: Ok, what happened to Roy when the gun went off?
 

 A: He had just opened the door getting out to use the bathroom and just fell to the ground.
 

 Q: What did you do after that?
 

 A: Put the car in drive and drove off....
 

 
 *304
 
 [[Image here]]
 

 Q: Where, where was everyone sitting at the time of the incident?
 

 A: Huh I was driving, Roy was in the passenger seat, and Jeanette was in the back.
 

 Q: After the incident when you shot Roy and you drove off, where did you (inaudible)?
 

 A: Try to make plans to distance myself from the situation. Went [and] threw the weapon away. We went, got a hotel.
 

 Q: Where did you throw the weapon at?
 

 A: On the way, in the river.
 

 Q: Across the levee?
 

 A: Yeah.
 

 Q: Ok.
 

 A: I think so. I threw it in the lake. One of the lakes. One of the bodies of water.
 

 Q: You know where it’s close to?
 

 A: I promise you, I can’t even remember exactly where.
 

 [[Image here]]
 

 Q: Were you upset when you shot him?
 

 A: Yeah.
 

 Q: Had you and Roy had incidents before ...
 

 A: Nothing that would require that ... would require me to want to see him go like that.
 

 Q: When you went to the hotel room, did you make any — did you say anything to Jeanette? Did you talk about anything?
 

 A: Yeah. Just talked about what happened, how — know—what—(inaudible) because the gun just went off.
 

 [[Image here]]
 

 Q: Can you describe the gun?
 

 A: It’s chrome 40. I think it’s a Taurus, automatic.
 

 Q: You remember anything that Jeanette was saying?
 

 A: I can’t remember, I remember — I remember being, I was intoxicated ...
 

 [[Image here]]
 

 Q: How much had you been drinking?
 

 A: Quite a few. Before we even got the two pints of gin, we had already been drinking a pint. Had been drinking all day long (inaudible). Had been drinking earlier (inaudible). We had been drinking all day long.
 

 Q: So would you say that kind of influenced what happened?
 

 A: I may have had assistance, assisted in it (inaudible).
 

 [[Image here]]
 

 Q: (inaudible)
 

 A: But uh look, I didn’t, it wasn’t, I wasn’t, I didn’t mean to shoot him. We were actually pulling over for him to use the restroom, not to shoot him (inaudible). I was turning around and the gun went off and just, you know, it was going too fast for me. I couldn’t do nothing. Couldn’t do nothing about it. Couldn’t do nothing.
 

 ¶ 10. Following a jury trial, Harris was convicted of manslaughter and an enhancement for using a firearm. He was sentenced by the circuit court judge to a term of twenty years and five years, respectively, to be served concurrently in the Mississippi Department of Corrections. Harris filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial. The motion was denied by the circuit court. Harris timely appealed.
 

 DISCUSSION
 

 I. Whether the jury should have been given a jury instruction on excusable homicide.
 

 ¶ 11. Harris argues that the circuit court erred in refusing to give the jury an
 
 *305
 
 instruction on excusable homicide. “It is well settled that jury instructions generally are within the discretion of the trial court, so the standard of review for the denial of jury instructions is abuse of discretion.”
 
 Thomas v. State,
 
 75 So.3d 1112, 1114 (¶ 9) (Miss.Ct.App.2011) (quoting
 
 Newell v. State,
 
 49 So.3d 66, 73 (¶20) (Miss.2010)). Our excusable homicide statute states:
 

 The killing of any human being by the act, procurement, or omission of another shall be excusable:
 

 (a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
 

 (b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;
 

 (c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.
 

 Miss.Code Ann. § 97-3-17 (Rev.2006). Harris relies upon subsection (a), which our supreme court has refused to the extent that the homicides were “committed in the course of an unlawful act.”
 
 Towner v. State,
 
 726 So.2d 251, 256 (¶ 14) (Miss.Ct. App.1998) (quoting
 
 Hailes v. State,
 
 315 So.2d 917, 918 (Miss.1975)).
 
 See also Nicholson ex rel. Gollott v. State,
 
 672 So.2d 744, 753 (Miss.1996);
 
 Thibodeaux v. State,
 
 652 So.2d 153, 167 (Miss.1995).
 

 ¶ 12. In the instant case, Harris admitted he was engaged in the unlawful activity of drinking and driving and was intoxicated at the time of the shooting. In his statement to police, he stated he was “riding and drinking,” he “had been drinking all day long,” and he “was intoxicated.” Thurman also testified that she, Harris, and Jackson had been drinking at the time of the shooting. It is undisputed that an intoxicated Harris pointed a loaded gun at Jackson. The loaded gun discharged, resulting in Jackson’s death. Such behavior by Harris clearly did not exhibit the “usual and ordinary caution” to warrant an excusable homicide instruction. Therefore, Harris was not entitled to an excusable homicide instruction. This issue is without merit.
 

 II. Whether the circuit court erred in failing to grant a directed verdict based on the rule announced in
 
 Weathersby.
 

 ¶ 13. Harris argues he should be acquitted under the
 
 Weathersby
 
 rule. The
 
 Weathersby
 
 rule states:
 

 [WJhere the defendant or the defendant’s witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
 

 Weathersby v. State,
 
 165 Miss. 207, 209, 147 So. 481, 482 (1933). However, when “conflicting eyewitness testimony is presented or physical evidence is presented in opposition to the defendant’s claim, ‘the case then becomes an issue for the jury. The jury is to determine if the defendant’s testimony is the more credible version of events and to decide either to convict or to acquit.’ ”
 
 Page v. State,
 
 64 So.3d 482, 488-89 (¶ 28) (Miss.2011) (quoting
 
 Jones v. State,
 
 39 So.3d 860, 864 (¶ 22) (Miss.2010)).
 

 ¶ 14. Our supreme court has held that “if an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for new trial.”
 
 Page,
 
 64 So.3d at 489 (¶ 29) (quoting
 
 Collins v. State,
 
 594 So.2d
 
 *306
 
 29, 36 (Miss.1992)). “The rationale behind this rule is to allow the trial judge the opportunity to consider the alleged error before the issue is on appellate review.”
 
 Id.
 

 ¶ 15. In the instant case, the record reflects that Harris did not raise the Weathersby-rule defense at trial or in his motion for JNOV. Therefore, Harris is procedurally barred from raising this issue for the first time on appeal.
 

 III. Whether the jury’s verdicts were contrary to the overwhelming weight of the evidence.
 

 ¶ 16. Finally, Harris argues that the verdicts were against the overwhelming weight of the evidence. This Court “must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial.”
 
 Cooper v. State,
 
 68 So.3d 741, 746 (¶ 11) (Miss.Ct.App.2011) (quoting
 
 Welch v. State,
 
 45 So.3d 1231, 1235 (¶ 13) (Miss.Ct.App.2010)). “When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush v. State,
 
 895 So.2d 836, 844 (¶ 18) (Miss.2005). A motion for new trial “is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.”
 
 Id.
 
 (quoting
 
 Amiker v. Drugs For Less, Inc.,
 
 796 So.2d 942, 947 (¶ 18) (Miss.2000)). In reviewing the weight of the evidence, we weigh the evidence “in the light most favorable to the verdict.”
 
 Id.
 
 “A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, ‘unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict.’ ”
 
 Id.
 
 (quoting
 
 McQueen v. State,
 
 423 So.2d 800, 803 (Miss.1982)). Instead, “the court simply disagrees with the jury’s resolution of the conflicting testimony.”
 
 Id.
 
 “This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves.”
 
 Id.
 
 Rather, “the proper remedy is to grant a new trial.”
 
 Id.
 

 ¶ 17. In the instant case, Harris told police that he had “a weapon in [his] hand when [Jackson] was getting out [of] the car and ... it went off.” Harris further described the type of gun as a .40 automatic, and he admitted throwing the gun away in the levy. Further, officers recovered a shell casing about ten feet from Jackson’s body, which was consistent with a .40 caliber according to Starks Hathcock, an expert in firearm identification and tool mark identification. Accepting as true Harris’s own statement that he shot Jackson with a .40 caliber automatic, along with the other evidence introduced at trial, we find that the guilty verdicts are not against the overwhelming weight of the evidence. This issue is without merit.
 

 CONCLUSION
 

 ¶ 18. Harris was not entitled to an excusable homicide instruction due to his illegal actions at the time of the shooting. Further, Harris waived any argument under the
 
 Weathersby
 
 rule by failing to raise and preserve that issue for appeal. Finally, the overwhelming weight of the evidence supports the guilty verdicts. Therefore, we affirm the judgment and sentence of the Circuit Court of Forrest County.
 

 ¶ 19. THE JUDGMENT OF THE WASHINGTON COUNTY CIRCUIT COURT OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF
 
 *307
 
 TWENTY YEARS AND A FIREARM ENHANCEMENT AND SENTENCE OF FIVE YEARS WITH THE SENTENCES TO RUN CONCURRENTLY ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WASHINGTON COUNTY.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE AND CARLTON, JJ., CONCUR. BARNES, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. ROBERTS, MAXWELL AND FAIR, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.
 

 [1]
 

 .
 
 Weathersby v. State,
 
 165 Miss. 207, 209, 147 So. 481, 482 (1933).