**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 96-CT-01058-SCT**

*DAYON JAMES a/k/a DAYON HASAN JAMES, SR.*
*a/k/a DAYON HASAN-NEVADA JAMES*

**v.**

*STATE OF MISSISSIPPI*

**ON WRIT OF CERTIORARI**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/15/1996 |
| TRIAL JUDGE: | HON. JERRY O. TERRY, SR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOSEPH P. HUDSON |
| | JAMES DONALD EVANS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: |
| | BILLY L. GORE |
| DISTRICT ATTORNEY | CONO CARANNA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 09/08/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRAVES, JUSTICE, FOR THE COURT:**

¶1.     In July 1996, Dayon James was convicted of capital murder and sentenced to life in prison.  James appealed,  and the appeal was assigned to the Court of Appeals which   reversed the judgment of the trial court and remanded the matter for further proceedings.   The State of Mississippi filed a motion for rehearing.   The Court of Appeals denied the State's motion for rehearing, withdrew the opinion, and substituted its modified opinion.   The Court of Appeals found that a hearing was required to determine whether jurors were exposed to extraneous

information and remanded the case to the trial court. *James v. State*, 777 So.2d 682 (Miss. Ct. App. 2000) (*James I*). The State and James each filed petitions for writ of certiorari, which were denied by this Court.

¶2. On remand the trial court conducted a hearing to determine if the jurors were exposed to extraneous information. Following testimony by the jurors who appeared, the trial court ruled that the verdict should not be impeached. The Court of Appeals affirmed the trial court's judgment and denied James' motion for rehearing on November 23, 2004. *James v. State*, --- So.2d ---, 2004 WL 1965662 (Miss. Ct. App. 2004) (*James II*). We granted James' petition for writ of certiorari. *James v. State*, 896 So.2d 373 (Miss. 2005). We find that the jury considered extraneous prejudicial information and James did not receive a fair trial. We also find that the failure to fully reconvene the jury constituted reversible error. We reverse the judgments of the Court of Appeals and the Harrison County Circuit Court, and we remand this case for a new trial consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶3. A discussion of the testimony and evidence from the trial in this matter may be found in *James I*.[1] We will only address those facts necessary for us to decide the issues raised in the petition for writ of certiorari.

¶4. In December 1995, James was charged in count I of a multiple count indictment for the murder of Shanekque Keyes. Under count II of the indictment, James was also charged for the

---

[1]The record is extensive and includes almost 1,800 pages of transcript. Numerous witnesses testified in both the guilt phase and the penalty phase of the trial. Five doctors testified at length as expert witnesses.

murder of one of Shanekque's older brothers, Alonso Smith. During pre-trial motions, the trial court granted the defense's motion to sever the counts and the State elected to try Shanekque's case first. Because the counts were severed, there is very little information in the record regarding Alonso. Great efforts were taken to make sure that no one mentioned any alleged injuries to Alonso in the presence of the jury. From pre-trial motions, post-trial motions, and testimony given outside the presence of the jury, it appears that the State alleges that Alonso was injured by James on or about June 7, 1995. At some point, Alonso was admitted to a hospital and died on or about June 10, 1995. On September 30, 1996, the trial court entered an order which suspended the trial of count II pending the disposition of James' appeal regarding count I.

¶5. Jury selection began on July 8, 1996. During voir dire by the trial court, the venire was asked if anyone had personal knowledge of the case or if they had read or heard anything about the case.[2] Many of the potential jurors knew of the case and several had formed opinions regarding James' guilt. Nettie Pettis and Susan John, who were seated on the jury, admitted to hearing about the case in the media. They both stated that they did not remember any details, had not formed any opinions, could put aside what they had heard, and decide the case based on the evidence. Carolyn Owens, who was chosen as an alternate juror, responded similarly. More importantly, however, jurors Rickman, Huntoon, Hoff, Hertzog, Plitt, King, Fazzio,

---

[2]This case was covered in the media at the time of the arrest and there was coverage regarding each phase of the proceedings. Each time it was mentioned that James was accused of murdering two children. "Separate crimes which should be tried individually can become inextricably intertwined in print and over the airways." *Hickson v. State*, 707 So.2d 536, 542 (Miss. 1997) (quoting *Johnson v. State*, 476 So.2d 1195, 1215 (Miss. 1985)).

Watson, Hudgeons, Jordan, and alternate juror Podlin did not respond to this group of questions. It can be inferred, therefore, that as of voir dire, they had not heard of the case. The trial judge concluded his voir dire and the court recessed for lunch before the attorneys began their voir dire. The trial court instructed the potential jurors as follows,[3]

> [L]et me caution you about this now. At this point in time you have heard the name of the accused. Some of you have indicated that you have heard something about this case or read something about this case. It would be highly improper for you to discuss anything with your fellow jurors during the recess as to what you know. If you've noted that one of your fellow jurors has read something about the case, it would be improper for you to inquire of that juror what they've heard about it. So do not discuss this case. . . . Do not read the newspaper. Don't listen to the radio or go watch TV during the noon hour because this is very critical that you keep an open mind, . . . that you be uncontaminated with any outside influences from this point on because it is very important that you do so.

Once the jurors were excused, the trial court asked the attorneys to avoid asking the questions he had already covered. Voir dire resumed when the jurors returned from lunch. Pursuant to the trial court's instruction, neither the State, nor the Defense, asked additional questions regarding whether anyone had heard about the case.

¶6.     Once voir dire of the entire venire was completed, the trial court sent the venire into another courtroom to wait while the court and the attorneys conducted individual voir dire. Individual voir dire took several hours. Only one of the jurors actually selected for the trial was questioned during individual voir dire, and he was only questioned regarding his views of the death penalty. Voir dire was finished late on the evening of July 9th and the trial began on July 10th. The State's case against James was based entirely on circumstantial evidence. The

---

[3]As will be discussed below, several members of the venire did not obey this instruction and discussed the case and the fact that James was accused of murdering more than one child.

jury returned with a verdict finding James guilty of capital murder and sentenced James to life in prison.

¶7.    A day after the trial, defense counsel was contacted with information regarding the jury's exposure to extraneous prejudicial information.  They immediately filed a Notice of Jury Exposure to Extraneous Information.  A hearing was held on August 14, 1996, and Wanda Conway, a member of the venire, was called to testify.  Conway explained that on July 9, 1996, she went to lunch with another prospective juror and Juror Shawn Watson.  The trial court recessed for lunch after the trial court had questioned the venire about knowledge of the case.  Contrary to the trial court's instructions, the women discussed the case for approximately ten minutes during their lunch.  Watson stated that she did not remember the case at all.  The other women discussed what they had heard in the media, including that James was accused of murdering another child.  When lunch was over, the venire was not questioned again as a group regarding their knowledge of the case.  Since Watson had not responded during voir dire, she was not on the list for questioning during individual voir dire.

¶8.    Conway also testified that later that afternoon the entire group was sent to sit in another courtroom.  They waited there while the trial court and attorneys were conducting individual voir dire, which took several hours.  Conway testified that she heard many members of the venire discussing the case and that there were two children involved.  She overheard a woman tell a man, who was ultimately selected as a juror, that James was accused of killing two young children.[4]

---

[4]When the trial court, during voir dire, asked the panel if they had heard about the case, none of the men actually seated on the jury responded.  Therefore, it can be inferred that this juror had not heard of the case before this incident.

¶9.     Conway testified that she spoke to Watson the day after the trial ended.  Watson told her that she had doubts about James' guilt and thought the mother should be investigated. Watson complained that some members of the jury knew about the second child and kept bringing it up in the jury room.  Watson told Conway that several jurors argued that James was guilty because "it was two children."  Watson asked Conway if she had seen the docket sheet posted outside the courtroom during jury selection.[5]  Neither Watson nor Conway noticed it. Watson told Conway that several of the jurors who saw the docket sheet discussed it in the jury room and stated that it indicated that James was charged with something else.  Watson said the docket sheet said "one of two, or first case, or something like that."

¶10.    At the conclusion of Conway's testimony, the Defense moved that the trial court conduct further investigation into the jury's exposure to extraneous information, pursuant to *Gladney v. Clarksdale Beverage Co.*, 625 So.2d 407 (Miss. 1993).  Defense counsel requested that the trial court bring the jurors in to be examined.  After arguments from both sides, the trial court ruled that there had not been a threshold showing that further inquiry was necessary under *Gladney,* and he denied the motion.  The trial court later denied James' other post-trial motions and James filed a notice of appeal.

¶11.    The appeal was assigned to the Court of Appeals.  On appeal, James raised seventeen issues.  On April 11, 2000, the Court of Appeals issued an opinion which reversed the trial court and remanded the matter for further proceedings.  The Court of Appeals held that the trial

---

[5]Prior to, and during, jury selection the court clerk placed an easel outside the courtroom which stated the style of the case.  The purpose was so the attorneys and parties would know which courtroom.  The docket sheet in this case stated, in capital letters, "REMARKS: JUDGE TERRY TO HEAR/1ST VICTIM."

court committed reversible error when it refused "to poll the jury regarding the allegation of the jury's consideration of extraneous information." *James v. State,* April 11, 2000 Court of Appeals opinion p. 3, ¶1. The Court of Appeals instructed the "trial court to hold a hearing for the purpose of determining whether extraneous prejudicial information was introduced into the jury's deliberations concerning the death of the other child." *Id.* at p. 28, ¶ 60. The Court of Appeals found all other assignments of error to be without merit. The State filed a motion for rehearing. James did not file a motion for rehearing, however, he did file a response in opposition to the State's motion.

¶12. The Court of Appeals denied the State's motion for rehearing, withdrew the original opinion, and substituted a modified opinion. *James v. State*, 777 So.2d 682 (Miss. Ct. App. 2000) (*James I*). In the modified opinion, the conclusion was rewritten regarding the hearing to be held by the trial court. *Id.* at 703 (¶ 71). James filed a motion for rehearing and raised arguments about most of the assignments of error. The Court of Appeals entered an order dismissing James' motion for rehearing pursuant to M.R.A.P. 40(a). Both the State and James filed petitions for writ of certiorari. The State's petition focused on the Court of Appeals' holding regarding the trial court's refusal to poll the jury regarding allegations of exposure to extraneous prejudicial information. James' petition responded to the State's and raised arguments regarding the sufficiency of the evidence, the sufficiency of the indictment, and the trial court's exclusion of certain evidence which supported James' theory of defense. On February 15, 2001, we denied both petitions.

¶13. The case was remanded to the trial court to reconvene and poll the jury regarding exposure to extraneous information. At the end of April 2001, almost five years after the trial,

7

the trial court and the attorneys met to discuss the procedures that would be used to locate the jurors and conduct the hearing. It was very important to the trial court that the purpose of the hearing be kept secret in order to avoid further contamination of the jury.[6]

¶14. Ultimately eleven of the twelve jurors and both alternates were located and served with summonses. At the hearing on May 15, 2001, eleven jurors and one alternate appeared and testified.[7] The trial court and attorneys were unable to locate juror John King. The trial court questioned each juror individually, while the other jurors were kept in a separate room. The following testimony was significant:

> BY THE COURT: At any time before you returned your verdict finding Dayon James guilty, were you informed or made aware from any source that Dayon James had been accused of killing another child other than the victim, Shanekque Keyes?

> BY JUROR HOFF: Someone in the jury room did mention something; I don't recall what. But it was an incidental comment. It was if they had noticed something on a bulletin board here in the courthouse or something, but I don't really recall.

Mr. Hoff could not recall when the comment was made or who made it. He also did not see the docket sheet.

> BY THE COURT: At any time before you returned your verdict finding Dayon James guilty, were you informed or made aware from any source that Dayon James had been accused of killing another child other than the victim, Shanekque Keyes?

> BY JUROR FAZZIO: Yes, sir.

---

[6]This effort was futile as there was an article in the local newspaper regarding the Court of Appeals opinion and that the jury would be questioned by the trial court regarding their knowledge of the second child. At least 3 jurors read the article.

[7]One alternate failed to appear at the hearing.

BY THE COURT: All right, sir. What information did you receive?

BY JUROR FAZZIO: Just what was said in court.

BY THE COURT: What was said in court?

BY JUROR FAZZIO: Yes, sir, that they mentioned it.

BY THE COURT: All right, sir. Now, do you remember whether that was mentioned by - - in open court during the court proceedings?

BY JUROR FAZZIO: I don't remember, sir. It was too long ago.

BY THE COURT: I understand. Do you remember the individual or the source of the information?

BY JUROR FAZZIO: No, sir.

BY THE COURT: What was it that you heard, or do you have any particular recollection as to what you heard concerning that?

BY JUROR FAZZIO: That there was a possibility of another incident.

BY THE COURT: I see. And that was all that was said?

BY JUROR FAZZIO: Yes, sir.

Mr. Fazzio thought he remembered seeing the docket sheet, but he could not be sure.

BY THE COURT: At any time before you returned your verdict finding Dayon James guilty, were you informed or made aware from any source that Dayon James had been accused of killing another child other than the victim, Shanekque Keyes?

BY JUROR WATSON: Yes.

BY THE COURT: All right. What was the source – or please identify for me the source that you learned that from.

BY JUROR WATSON: I think it was a paper outside the courtroom, and his name was listed two times.

BY THE COURT: Two different times?

BY JUROR WATSON: Yes.

. . . .

BY THE COURT: Okay.  Now, you're referring, I take it, to the easel --

BY JUROR WATSON: Yes.

BY THE COURT: – that was posted outside the courtroom here.

BY JUROR WATSON: Right.

. . . .

BY THE COURT: All right.  Is that the only source of any information that you had concerning Mr. Dayon James?

BY JUROR WATSON: I want to say some of the other jurors talked about it, his name being on that easel twice.

BY THE COURT: Now, when you say "some of the other jurors," would that have been some of the other jurors who were actually selected to serve on the case and did serve on the case --

BY JUROR WATSON: Yes.

BY THE COURT: – such as yourself?

BY JUROR WATSON: Yes.

BY THE COURT: Can you identify which ones it may have been?

BY JUROR WATSON: No, I can't.  I can't.

BY THE COURT: Can you give me any specifics as to what was said concerning it?

BY JUROR WATSON: Just that it was another child involved.

Ms. Watson informed the court that she read an article in the paper that an inquiry would be made of the jury.

10

BY THE COURT: All right. Do you have any suspicions of what you're here about?

BY JUROR JORDAN: Yes.

BY THE COURT: What?

BY JUROR JORDAN: The case, the jury duty that everyone was on.
. . . .

BY THE COURT: Okay. Now can you give me any reason why you would be suspicious that it's about that case?

BY JUROR JORDAN: I did read in the paper about six months ago that the jury would be called back in for questioning.
. . . .

BY THE COURT: Okay. I'm required to ask you these questions now, Ms. Jordan: From the time you arrived at the courthouse in response to your jury summons until the time you were finally discharged by the court at the conclusion of the trial, did you receive or learn of any information about the accused, Dayon James, from any source other than the evidence which was presented to you in open court?

BY JUROR JORDAN: No.

BY THE COURT: You thought about that for a moment. Do you want another moment to think about it? I'm not rushing you.

BY JUROR JORDAN: Just from any other source?

BY THE COURT: Yes ma'am. Did you learn anything from the time you were selected to be on this jury and the time that you reached your verdict and was discharged from the case, did you learn from any other source any information about Mr. James other than what was here in this courtroom?

BY JUROR JORDAN: Well, there was some discussion one time about another child being involved.

BY THE COURT: All right. And what was that – when was that discussion; do you remember?

11

BY JUROR JORDAN: Well, there are several witnesses testified that said "children;" they mentioned children.

BY THE COURT: I see.

BY JUROR JORDAN: More than one child.

BY THE COURT: And so you're saying that that was here in the courtroom; there were witnesses testifying to that?

BY JUROR JORDAN: Yes.

BY THE COURT: Okay. Was there any discussion of that with anybody other than witnesses at this witness stand --

BY JUROR JORDAN: No.

BY THE COURT: – that you remember?

BY JUROR JORDAN: Well, we did – in the jury room did mention this coming up with children.

BY THE COURT: Okay.

BY JUROR JORDAN: But no one knew any details.
. . . .
BY THE COURT: At any time before you returned your verdict finding Dayon James guilty, were you informed or made aware from any source that Dayon James had been accused of killing another child other than the victim, Shanekque Keyes?

BY JUROR JORDAN: No, not other than, you know, just seeing that there was children.

BY THE COURT: I see. The reference to "children?"

BY JUROR JORDAN: Uh-huh (affirmative)
. . . .

BY THE COURT: Okay. Now, Ms. Jordan, the clerk of the court sometimes posts on an easel in the hallway outside the courtroom a copy of the court's docket, the cases scheduled for hearing, so that witnesses and other interested

12

parties can know which courtroom to go to. Did you see the docket that was posted out in the hallway?

BY JUROR JORDAN: Yes, I did.

BY THE COURT: You did see it?

BY JUROR JORDAN: Yes, I did. And there was children on there.

BY THE COURT: Did you read it?

BY JUROR JORDAN: I think so. We did.

BY THE COURT: And so would that have been before the jury was selected, before you were actually selected?

BY JUROR JORDAN: Yes, it was.

BY THE COURT: Do you remember what you read on that docket?

BY JUROR JORDAN: No. But I know there was children on there too. It wasn't just one child, there was children.

BY THE COURT: I see. And that's all you can remember?

BY JUROR JORDAN: That's all I can remember.

¶15. The trial court refused to allow the attorneys to question the jurors. At the conclusion of the testimony, the trial court allowed the attorneys to present arguments. The trial court took the matter under advisement and ultimately determined that extraneous information had been communicated to the jury. However, the trial court found that this communication was incidental and that the jury verdict should not be impeached. The trial court's findings were certified to the Court of Appeals and the Court of Appeals allowed the parties to file supplemental briefs.

13

¶16.    The Court of Appeals issued its opinion.  *James v. State*, 2004 WL 1965662 (Miss. Ct. App. 2004) (*James II*).   James raised the following issues: "(1) the polling procedure denied him due process and equal protection, (2) the failure to fully reconstitute the jury denied him due process, (3) the failure to grant his motion for a new trial was error, (4) the failure to sustain his objections to the jury polling procedure and the polling questions was error, (5) the failure to allow him to poll the jury was error, and (6) the court failed to sanction the State for improper contact with the jury."   *Id.* at *4.   The Court of Appeals found these issues to be without merit and affirmed the judgment of the trial court.   The Court of Appeals denied James' motion for rehearing and this Court granted James' petition for writ of certiorari. *James v. State*, 896 So.2d 373 (Miss. 2005).

## ISSUES RAISED IN PETITION FOR WRIT OF CERTIORARI

(1) Whether medical opinion is sufficient evidence to warrant a conviction in a circumstantial evidence capital murder case.

(2) Whether failure to fully reconstitute or reconvene the jury denies Appellant due process and equal protection of the laws as guaranteed by the U.S. and Mississippi Constitutions.

(3) Whether [almost five] years after the discharge of the jury and after the Court of Appeals has issued its opinion is impractical and unreasonably long to attempt to reconvene or reconstitute the jury and unfairly prejudiced Appellant.

(4) Whether unanimity of responses is required, or to what extent is unanimity required, when jurors are reconvened [almost five] years after being discharged and reconstitution of the jury is incomplete.

(5) Whether after the Court of Appeals withdraws an opinion and substitutes another or modified opinion a party can file a motion for rehearing.

(6) Whether the Court of Appeals applied the wrong standard.

(7) Whether the correct standard was used to determine whether the introduction of extraneous prejudicial information into jury deliberations required Appellant to receive a new trial.

(8) Whether the indictment sufficiently apprised Appellant of the charges against him and whether the indictment was properly amended.

(9) Whether the trial court improperly restricted the Appellant from presenting evidence essential to his theory of defense and on the issue of jury exposure to extraneous prejudicial information.

## DISCUSSION

## JURY'S EXPOSURE TO EXTRANEOUS PREJUDICIAL INFORMATION

¶17.    In issues 2, 3, 4, 7 and 9 James raises arguments regarding the jury's exposure to extraneous prejudicial information and the procedures used by the trial court in examining the jury regarding that exposure.    An accused's right to a fair trial before an impartial jury is guaranteed by the federal and state constitutions.    *Gray v. State*, 799 So.2d 53, 62 (Miss. 2001) (citing U.S. Const. amend. VI and Miss. Const. art., 3 §§ 14 & 26).    "Because on appeal we must as a matter of practical and institutional necessity defer to jury determinations of fact questions, we must be vigilant that the jury making such findings is infected by not the slightest taint or suggestion of bias or unfairness."    *Fisher v. State*, 481 So.2d 203, 126 (Miss. 1985). We have stated:

> Where the resolution of a case comes down to factual disputes, the jury's role becomes paramount as it weighs the credibility of the witnesses and determines which factual accounts to accept or reject. *Thus, it is absolutely imperative that the jury be unbiased, impartial, and not swayed by the consideration of improper, inadmissible information*. We can not say, with any degree of certainty, that this was the case here because the fact of the matter is that the juror "threw the proverbial skunk into the jury [room]" during the deliberations by asking about other charges against Hickson. *See **Dunn v. U.S.**,* 307 F.2d 883, 886 (5th Cir. 1962) ("'[I]f you throw a skunk into the jury box, you can't instruct the jury not to smell it'").

*Hickson v. State*, 707 So.2d 536, 544 (Miss. 1997) (emphasis added).

¶18.    In *Gladney v. Clarksdale Beverage Co.*, 625 So.2d 407 (Miss. 1993), this Court

formulated a "systematic method" to be used to "inquire into juror verdicts" pursuant to M.R.E.

606(b). *Id*. at 416.  M.R.E. 606(b) provides,

> **(b) Inquiry Into Validity of Verdict or Indictment**. Upon an inquiry into the
> validity of a verdict or indictment, a juror may not testify as to any matter or
> statement occurring during the course of the jury's deliberations or to the effect
> of anything upon his or any other juror's mind or emotions as influencing him
> to assent to or dissent from the verdict or indictment or concerning his mental
> processes in connection therewith, *except that a juror may testify on the
> question whether extraneous prejudicial information was improperly
> brought to the jury's attention or whether any outside influence was
> improperly brought to bear upon any juror*. Nor may his affidavit or evidence
> of any statement by him concerning a matter about which he would be precluded
> from testifying be received for these purposes.

(emphasis added).  *Gladney* first provides that "the trial court and opposing counsel must be

made aware of any potential juror misconduct when this evidence is manifested."  625 So. 2d.

at 418.  Next it must be determined if an investigation is warranted.  "In order for the duty to

investigate to arise, the party contending there is misconduct" must make a threshold showing

that "there was in fact an improper outside influence or extraneous prejudicial information."

*Id.* at 418-19.  When the threshold showing is made, the trial court should conduct a post-trial

hearing. *Id.* at 419.

> The scope of the hearing is however, limited; the proper procedure is for the
> judge to limit the questions asked the jurors to determine whether the
> communication was made and what it contained.  Once it is determined that the
> communication was made and what the contents were, the court is then to decide
> *whether it is reasonably **possible** this communication altered the verdict*.

*Id*. (emphasis added).  M.R.E. 606(b) makes it abundantly clear that

> a juror may not testify as to any matter or statement occurring during the course
> of the jury's deliberations or to the effect of anything upon his or any other
> juror's mind or emotions as influencing him to assent to or dissent from the

16

verdict or indictment or concerning his mental processes in connection therewith.

*Gladney* offers no interpretation nor explanation which is inconsistent with, or different from, M.R.E. 606(b). That is to say that it would be inappropriate, and in violation of M.R.E. 606(b), for any juror to be questioned with regard to whether or not the extraneous information actually altered his verdict. If it is reasonably possible that the communication altered the verdict, then a new trial must be ordered. *United States v. Davis*, 15 F.3d 1393, 1412 (7th Cir. 1994).

¶19. In the case at bar, counsel for James was advised of the misconduct on July 16, 1996, the day after the trial. They followed the dictates of *Gladney* regarding notification and requested that the jurors be examined. In *James I*, the Court of Appeals correctly found that James made a threshold showing and that the trial court abused its discretion in refusing to examine the jurors. *James I*, 777 So.2d at 699-700. We agree with the Court of Appeals' "conclusion that Conway's testimony more than satisfied the minimum requirements of *Gladney* and provided a sufficient basis for the trial court to hold a hearing for the purpose of determining whether extraneous prejudicial information was introduced into the jury's deliberations concerning the death of the other child." *Id.* at 700.

¶20. The hearing required by *Gladney* was finally conducted on May 15, 2001, four years and ten months after the trial. One juror could not be located. All of the jurors, who could be located, stated that they could not remember certain details. James argues that the failure to fully reconvene the jury was reversible error. We agree. "The constitutional right to trial by jury includes as its essential elements that the jury shall consist of twelve impartial men,

17

neither more nor less, and that the verdict shall be unanimous." *Markham v. State*, 209 Miss. 135, 46 So.2d 88, 89 (1950) (citations omitted). In the present matter, James contends that all members of the jury were exposed to the prejudicial extraneous information when the jurors discussed the allegations regarding the second child in the jury room. Pursuant to *Gladney*, James had a right to examine the missing juror to determine "whether it is reasonably possible [that the] communication altered [his] verdict." *Gladney*, 625 So.2d at 419. Since the trial court was unable to locate the missing juror, it should have granted James' motion for a new trial. We find that the trial court's failure to fully reconvene the jury for the hearing was reversible error and mandates a new trial.[8]

¶21. James also argues that the passage of time made reconvening the jury impracticable and made a new trial necessary. James cites *State v. Rideout*, 725 A.2d 8, 11 (N.H. 1999) in support of his argument. In *Rideout* the trial court conducted a post-trial hearing, in November 1996, regarding a juror's contact with a witness for the prosecution. The trial court denied the motion to set aside the verdict based on the contact. In its February 1999 opinion, the New Hampshire Supreme Court found that further investigation should have been conducted, but based on the passage of time, reconvening the jury was impracticable and a new trial was granted. As discussed by the Court of Appeals in *James II*, the facts in *Rideout* can be distinguished. *James II*, 2004 WL 1965662 at *4-5. However, the New Hampshire Supreme Court's discussion regarding reconvening a jury several years after a trial is concluded is

---

[8] Although not all hearings mandated by *Gladney* will require the examination of all of the jurors, in the present matter, it was alleged that all jurors were exposed, so all jurors should have been examined.

18

helpful.  *See also* **Haugh v. Jones & Laughlin Steel Corp.**, 949 F.2d 914, 919 (7th Cir. 1991) ("nor is it irrelevant that the case is already a decade old.")  We find that the passage of time was unfairly prejudicial to James and violated his due process rights.

¶22.    We find, based on the standard established in *Gladney*, that it is "reasonably possible that [the] communication altered the verdict" and a new trial should be granted.  *Gladney*, 625 So.2d at 419.  Wanda Conway testified immediately after the trial and the State did not attempt to rebut her testimony.  Her uncontroverted testimony and the record from jury selection reveal that neither jurors Watson, Jordan, nor any of the male jurors responded to the trial court's inquiry about knowledge of the case.  Watson was later informed, during lunch recess, that James was accused of killing another child.  Many members of the venire discussed the allegations regarding a second child while they were waiting in a separate courtroom.  At this time one male juror was informed of the allegations regarding the second child.  At no point following these exposures to extraneous information were the jurors asked again if they had knowledge of the case, or if they could set aside that knowledge and be fair and impartial.

¶23.    Conway also testified that Watson spoke with her the day after the trial. Watson complained that some members of the jury knew about the second child and kept bringing it up in the jury room.  Watson stated that several jurors argued that James was guilty because "it was two children."  Watson also discussed that the docket sheet supported the allegation that a second child was involved.

¶24.    The hearing was held on May 15, 2001,  to determine whether extraneous information was communicated to the jury and the content of that communication.  During voir dire on July 9, 1996, jurors Pettis and John and alternate juror Owens were the only selected jurors who

19

had heard about the case in the media. They all stated that they did not remember any details, had not formed any opinions, could put aside what they had heard, and decide the case based on the evidence. Jurors Hoff, Fazzio, Watson and Jordan admitted, during the May 2001 hearing, that they had heard that James had been accused of killing a second child. Since it can be inferred that they did not know this information during voir dire, the trial court correctly found that they had been exposed to extraneous information.

¶25.    During the May 2001 hearing, Juror Jordan stated that she knew about the allegations regarding the second child because she heard testimony during the trial which referred to "children." The record has been scoured for the word "children" stated during the trial in the presence of the jury. Although the word "children" was stated a few times during testimony, there is nothing in the record to support Juror Jordan's statement that witnesses mentioned that James was involved in the death of a second child.[9] There is also nothing in the record to indicate that the State, the Defendant, or the trial court stated or suggested that James was accused of killing a second child.

¶26.    Jurors Watson and Jordan both stated that the docket sheet implied that two children were involved. The docket sheet states "REMARKS: JUDGE TERRY TO HEAR/1ST VICTIM." Jurors Hoff, Watson and Jordan admitted that the fact that James was accused of killing another child was discussed in the jury room. The fact that, after almost five years, these jurors did not remember exactly what was said or who said it, does not lessen the fact that they did discuss the allegations regarding the second child.

---

[9]For example Toni James testified that she and James were the parents of two children. Consuella testified that she took her children shopping with Toni and that she had children riding with her at the time of the near collision.

¶27. Pursuant to *Gladney*, extraneous prejudicial information was communicated to the jury. The content of that communication was that James was accused of killing another child. During pre-trial hearings the trial court ruled that this information was very prejudicial and that the jury would not be allowed to hear it. "[I]t is reasonably *possible* this communication altered the verdict." *Gladney*, 625 So.2d at 419 (emphasis added). Although the exact source of the communication will never be known, the fact that the "skunk" was thrown into the jury room mandates a new trial. *Hickson v. State*, 707 So.2d 536, 544 (Miss. 1997) (citing *Dunn v. United States.*, 307 F.2d 883, 886 (5th Cir. 1962)).

¶28. We further find that the trial court erred when it refused to allow the attorneys to examine the jurors during the May 2001 hearing. Nothing in *Gladney* or its progeny prohibit attorneys from examining the jurors. *Hickson* 707 So.2d at 541; *Gladney* 625 So.2d at 418-19. "No provision prevents a lawyer from talking to a juror or securing affidavits from jurors to the effect that an 'outside influence' was brought to bear." *Brake v. Speed*, 605 So.2d 28, 37 (Miss. 1992) (citing M.R.E. 606(b)). "The breath of questioning should be sufficient 'to permit the entire picture to be explored.'" *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2nd Cir. 1983) (quoting *United States. v. Moten*, 582 F.2d 654, 667 (2nd Cir. 1978)). Within the dictates of *Gladney* and M.R.E. 606(b), the attorneys should have been allowed to question the jurors or the trial court should have asked additional questions submitted by the attorneys.

## MOTION FOR REHEARING AND REMAINING ISSUES

¶29. James argues that when the Court of Appeals substituted its modified opinion on September 26, 2000, it in fact issued a new opinion and he should have been allowed to file a motion for rehearing. This argument is without merit. The only change in the modified opinion was the conclusion. The holdings of the Court of Appeals regarding all of James' assignments of error remained unchanged. Accordingly, the deadline to seek rehearing of those holdings was April 25, 2000. Although James responded to the State's motion for rehearing, he failed to timely file his own motion regarding the *James I* opinion. M.R.A.P. 40 does not require clarification. Because James failed to timely file a motion for rehearing following the Court of Appeals's April 11, 2000 opinion, all of the remaining issues are procedurally barred.

## CONCLUSION

¶30. For the foregoing reasons, we find that the jury considered extraneous prejudicial information and that James did not receive a fair trial. We further find that the failure to fully reconvene the jury constituted reversible error. We reverse the judgments of the Court of Appeals and the Harrison County Circuit Court, and we remand this case for a new trial consistent with this opinion.

¶31. **REVERSED AND REMANDED.**

   **SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**