CARLTON, J.,
 

 for the Court:
 

 ¶ 1. A jury in the DeSoto County Circuit Court convicted William Stanley Wilson II of Count I, murder, and Count II, arson in the first degree. The trial court sentenced Wilson as a habitual offender pursuant to Mississippi Code Annotated section 99-19-81 (Rev.2007) to life for the murder conviction, and to a consecutive term of twenty years for the arson conviction, all in the custody of the Mississippi Department of
 
 *424
 
 Corrections (MDOC) without eligibility for parole or probation. Subsequently, Wilson filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, motion for a new trial, which was denied by the trial court. Wilson appeals and raises the following issues: (1) whether the weight of the evidence supports the verdicts; (2) whether the verdicts are invalid because of juror misconduct; (3) whether the trial court erred in allowing the State to use Wilson’s prior conviction and supervised-release status in its case-in-chief; and (4) whether the trial court erred by allowing hearsay statements into evidence.
 

 ¶ 2. Finding no error, we affirm.
 

 FACTS
 

 ¶3. A fire originated in the home of Valetta Jho Stamps in Southaven, Mississippi, during the early morning hours of September 23, 2008.
 

 ¶ 4. That same morning, Lieutenant Sean Lenihan, of the Southaven Fire Department, responded to a call regarding the fire. Lieutenant Lenihan testified that once at the scene, he entered the residence and located a female victim lying in the hallway. Lieutenant Lenihan testified that he and another firefighter removed the victim from the residence and placed her in the backyard of the residence. Charles Fitch, a paramedic with the Sou-thaven Fire Department, testified that he also responded to a call regarding the residential fire. Fitch testified he arrived at the scene at 6:51 a.m. and began tending to the female victim pulled from the residence. Fitch further testified that after inspecting the victim’s body, he was able to determine that the victim had been dead for at least an hour.
 

 ¶ 5. Ronald L. White, Deputy Chief of Operations and Fire Marshal for the City of Southaven, also responded to a call in reference to the fire. Fire Marshal White testified that upon arriving at the scene, he noted that the residence was a one-story mobile home with smoke coming from the rear of the residence. Fire Marshall White testified that Captain Roger Thornton, the fire officer in charge of the scene, informed him that the firefighters entered the residence by force, recovered one female victim in the rear of the structure, and put the fire out. Fire Marshal White testified that he investigated the residence and noticed that the most extensively damaged area was near a bed in the rear bedroom. Fire Marshal White testified, in his opinion, the fire was the result of an open flame and was arson.
 

 ¶ 6. Detective Jeff Logan, of the Southa-ven Police Department, was also involved in the investigation. Detective Logan testified that he went to Stamps’s residence on the day of the fire and conducted an initial walkthrough of the residence. Detective Logan testified that during the walkthrough, he searched a room located in the front of the residence, which he referred to as the “junk room,” and found a hammer with blood and hair on its exterior in the far back portion of the room behind a piano. Detective Logan testified that he also collected two pieces of burnt clothing from the bed in the rear room where the fire had taken place. Detective Logan testified that he also collected the shoes and clothes Wilson was wearing that day, as well as the steering wheel cover and floor mats from Wilson’s car. Detective Logan further testified that he sent the steering wheel cover, the hammer, and the shoes to the crime lab for testing. Detective Logan also testified that he noticed that the bathtub was wet and looked as if someone had taken a bath or a shower in it. Detective Logan testified he interviewed Wilson later that day, specifically questioning him as to his knowledge of
 
 *425
 
 the hammer. Detective Logan testified that during the interview, he asked Wilson twice if he had ever seen the hammer to which Wilson replied that he had not. Detective Logan testified that he then asked Wilson if he had ever touched the hammer, and Wilson responded, “I may have. I touch a lot of things.” Detective Logan testified that Wilson made six different statements during the interview about how he had never seen the hammer. Detective Logan testified that Wilson stated during the interview that he had taken a shower before he left the mobile home. Detective Logan further testified that during the interview, Wilson admitted to him that he had an argument with Stamps after Stamps approached him about money that she was missing and accused him of stealing it from her. Detective Logan further testified that Wilson also told him that he knew that Stamps had talked to Joseph Parks and her son about the missing money that she accused him of stealing.
 

 ¶ 7. Detective Misha Kimbell, of the Sou-thaven Police Department, was also involved in the investigation. Detective Kimbell testified that after arriving at Stamps’s residence at approximately 8:00 a.m. on the day of the fire, she spoke with the owner of the residence, Jim Palmer, who told her that Stamps and Wilson were living together in the residence. Detective Kimbell testified that Palmer then provided her with the contact information for both Stamps and Wilson, and Palmer provided a phone number and a vehicle description for Wilson. Detective Kimbell testified that she had some other officers travel to Horn Lake to speak with Wilson’s mother, Debbie Linton, who provided them with Wilson’s phone number and vehicle description. Detective Kimbell testified she attempted to contact Wilson on that phone number, and left him a voice message asking him to call her back. Detective Kimbell testified that later that same day, between 4:80 p.m. and 5:00 p.m., Linton informed her that Wilson was on his way to her house. Detective Kimbell testified that she questioned Wilson about his whereabouts earlier that day, to which he replied that he woke up between 4:45 a.m. and 4:50 a.m., spoke to his aunt, left the trailer between 5:45 a.m. and 6:00 a.m., and went to Arkabutla Lake for the remainder of the day. Detective Kimbell testified Wilson also provided her with a written statement during the interview. Detective Kimbell read the statement to the court, as follows:
 

 The first line says, William S. Wilson, II, 5-21-78 on the second' line, then skips a line and says, “I woke up at around 4:50 or 5:00 a.m. I smoked a cigar and got alive. I got in the shower and threw some clothes in the dryer. I talked to Aunt Jho for about 15 minutes, told her I was going to go running and asked her to check on the car in the driveway with my cousin to find out what was going on with it. I left at around 15 till or 6:00 a.m. and stopped at the Bull Market to get gas and a cup of ice for my cooler and a Coke. I then went to Pleasant Hill Landing and listened to Rover’s Morning Glory on 92.9 and then proceeded to” — I can’t read the next word — “and go jogging. I came back to the car and lounged and smoked a few cigars for a while. I went to the store at Starland-ing and 51 and bought a Sprite and went back to the lake and hung out for a while. I turned my phone on and found I had like 42 missed phone calls and a few voice mails and text messages. I started calling people and made my way to my mom’s house. I had to stop and vomit on the side of the road. I just — I got almost to my mom’s house and found out the police were there and freaked because my friend, Cheryl, told me that I was all over the news as a murder
 
 *426
 
 suspect.” I can’t read the next word. “I drove the neighborhood to 301 and pulled behind — pulled back in to the neighborhood. After talking to Detective Beith, I went to my mom’s house and proceeded to answer questions for Detective Beith and her partner.” And then he signed it and printed his name and wrote the date on it.
 

 Detective Kimbell testified that she later subpoenaed Wilson’s cell phone records and found the records to be inconsistent with Wilson’s explanation as to his whereabouts on the day in question. Detective Kimbell also testified that she asked Wilson if he had been back to the mobile home since he left earlier that day, and he initially denied returning to the mobile home. Detective Kimbell testified that once she confronted Wilson with the fact that a news crew had filmed him going by the mobile home, he admitted that he went back by the residence that day. Detective Kimbell also testified that after investigating the case, she was able to determine that Wilson had lived in the room that burned in the mobile home. Lastly, Detective Kimbell testified that Wilson’s last statement regarding the hammer found at Stamps’s residence was that if his DNA was found on the hammer, it was because the officers had planted it there.
 

 ¶ 8. Wilson was indicted by the grand jury of DeSoto County on April 16, 2009, as a habitual offender pursuant to section 99-19-81 for the crimes of murder and first-degree arson. A pretrial hearing was held whereby the court evaluated the admissibility of testimony concerning Wilson’s earned-release supervision (ERS). The trial court found the proof as to Wilson’s ERS status relevant to motive and more probative than prejudicial. The trial court, however, found no necessity in disclosing the details of the offense for which he was convicted to the jury. Wilson’s trial commenced on October 26, 2009. At trial, the State and Wilson stipulated that at the time of Stamps’s death, Wilson was on ERS from the MDOC.
 

 ¶ 9. At trial, Parks testified that he was dating Stamps in September 2008. During direct examination, Parks testified that he visited Stamps on the weekend prior to September 28, 2008, the day of the fire. Parks testified that as he was leaving Stamps’s residence on the Monday morning following the weekend, he left Stamps $100 to pay a traffic ticket. Parks testified that when he spoke to Stamps later that day, she told him that the money he gave her, along with some additional money that she had left in the house, was missing. Parks testified that Stamps told him that only she and Wilson were in the house since Parks left her the money and that she thought Wilson took the money.
 

 ¶ 10. Parks testified that because Stamps was worried about paying the traffic ticket, he then sent her $400 by Western Union that afternoon. Parks further testified that after he sent the money, he last spoke to Stamps at approximately 11:00 p.m. or 11:30 p.m. Parks testified that during this conversation with Stamps, she told him that she was going to go to sleep and that she would confront Wilson about the money and about having to find somewhere else to stay in the morning.
 
 [1]
 
 Stamps was not seen or heard from alive again.
 

 ¶ 11. Dr. Bo Scales, with Scales Biological Laboratory, testified at the trial regarding the DNA evidence. Dr. Scales
 
 *427
 
 testified that he performed testing on the hammer that was found at Stamps’s residence. Dr. Scales testified that he obtained DNA from the sample on the head of the hammer and was able to match the DNA to the sample of Stamps’s DNA. Dr. Scales further testified that he was able to extract skin cells from the hammer handle, and after comparing the cells to the samples of Stamps and Wilson, concluded that “[t]here were no genetic markers in that mixture of DNA taken from the handle that could be attributed to anyone other than, in this case, the DNA from Ms. Stamps and from Mr. Wilson.” Dr. Scales further testified, in his opinion, it would have taken more than a casual touching to get the amount of DNA that was pulled from the hammer, but if the hammer had been gripped or used, it would provide the kind of DNA seen in the test in terms of quantity. Dr. Scales also testified he conducted testing on Wilson’s shoes and the steering wheel cover from Wilson’s car, but did not find any DNA on the items. Dr. Scales further testified that he did not receive any clothing or Stamps’s fingernail clippings for testing.
 

 ¶ 12. Dr. Feng Li also testified. Dr. Li testified that he performed Stamps’s autopsy and was able to determine upon external examination that she suffered multiple blunt force injuries. Dr. Li also testified that weapons such as baseball bats and hammers can cause blunt injuries to the body and that some of Stamps’s lacerations were consistent with injuries caused by a hammer. Dr. Li further testified that he also determined the manner of death to be homicide.
 

 ¶ IB. With respect to evidence of Wilson’s location at the time of the murder, Nita Knox testified that she was one of Stamps’s neighbors. Knox testified that at approximately 5:00 a.m. on September 28, 2008, while walking outside with her dog to get the newspaper, she saw three vehicles parked in the driveway next door: a maroon vehicle that she knew to be inoperable, a white SUV, and a tan car. Knox then testified that later that morning at approximately 6:40 a.m., or 6:45 a.m., as her husband was leaving, she stuck her head out the door to tell him something and noticed smoke rising from the residence next door. Knox testified that she then went back into the house and called the fire department. Knox further testified that she noticed that only two cars were parked in the driveway at this time— the white SUV and the inoperable vehicle. The tan car similar to Wilson’s vehicle was at Stamps’s mobile home at 5:00 a.m. and then gone later that morning when the mobile home was on fire.
 

 ¶ 14. Judy Hutsell testified as a defense witness during the trial. Judy testified that on the morning of the fire, she passed by her son’s house on her way to work and saw someone in his backyard. Tom Hut-sell also testified at trial as a defense witness. Tom testified that he lived two doors down from Stamps’s residence. Tom further testified that on the morning of the fire, his wife awoke him and told him that the dog was barking. Tom testified that he got out of bed and heard somebody tell the dog to be quiet. Tom testified that he walked outside, but he did not see anyone.
 

 ¶ 15. Wilson testified that in September 2008, he was living with his aunt, Stamps.
 
 [2]
 
 Wilson testified that he drove a gold Buick Century.
 
 [3]
 
 Wilson testified that on the afternoon of September 22, 2008, he and
 
 *428
 
 Stamps were involved in a confrontation in which Stamps questioned him about stealing money from her. Wilson testified that he denied taking the money, and he and Stamps resolved the issue. Wilson testified that on September 22, 2008, he and Stamps watched television together and she fixed dinner. Wilson testified that later that evening, he went to his room to play on the Internet and smelled pot smoke coming from another room. Wilson testified that he then left the residence at 12:15 a.m. and did not come back. Wilson testified that he received a voice mail from Detective Kimbell the next day asking him to return her phone call. Wilson testified that he did not answer any phone calls after he received Detective Kimbell’s voi-cemail because he thought the calls concerned his ERS status, and he was worried that he had violated his ERS requirements. Wilson further testified that he did not find out that Stamps had died until he called his cousin, Jason Irby, at approximately 3:30 p.m. or 4:00 p.m. on September 23, 2008. Wilson testified that after he found out that Stamps had died, he went to his mother’s house to talk to the detectives. Wilson also testified that he gave the detectives a statement at his mother’s house, went to the police department to file an official report, consented to a search of his car, and provided the officers with his DNA.
 

 ¶ 16. Wilson further testified that he provided a false written statement to the police officers concerning his whereabouts on the day in question because he had been in Memphis, Tennessee, in violation of his ERS curfew, which required him to be home between the hours of 12:00 a.m. and 6:00 a.m. Lastly, Wilson testified that the hammer found at Stamps’s residence was a hammer that he used at his grandfather’s farm to stretch barbed wire. Wilson testified he was unsure how the hammer got from his grandfather’s farm in Charleston, Mississippi, to Stamps’s residence in Southaven, Mississippi. Wilson testified that he falsely denied the officer’s initial inquiries as to whether he knew about the hammer because he “kind of seen [sic] where the questioning was
 
 going,
 
 that they thought that [he] had something to do with it.”
 

 ¶ 17. Wilson filed a post-trial motion for a JNOV or, in the alternative, a motion for a new trial, which was subsequently denied by the trial court. Aggrieved, Wilson appeals.
 

 DISCUSSION
 

 I. SUFFICIENCY AND WEIGHT OF THE EVIDENCE
 

 ¶ 18. Wilson appeals the trial court’s decision to deny his motion for a directed verdict and his motion for a JNOV or, in the alternative, a motion for a new trial. Specifically, Wilson argues that the case against him is entirely, and tenuously, circumstantial and fails to establish facts upon which he could be convicted.
 

 ¶ 19. Wilson combines his arguments regarding the weight of the evidence and the legal sufficiency of the evidence. Because these issues are two distinct issues, we will discuss each separately.
 
 See Bush v. State,
 
 895 So.2d 836, 843 (¶ 15) (Miss.2005) (outlining the differences between legal sufficiency of the evidence and the weight of the evidence);
 
 Wells v. State,
 
 57 So.3d 40, 45 (¶ 9) (Miss.Ct.App.2011).
 

 A. Sufficiency of the Evidence
 

 ¶ 20. Wilson argues that the trial court should have sustained his motion for a directed verdict, or otherwise, should have granted his motion for a JNOV because, even accepting all the State’s evidence as true, the State failed to make a
 
 *429
 
 prima facie case of murder and arson.
 
 [4]
 
 Further, Wilson contends that the evidence failed to establish a set of facts upon which a jury could reasonably render a guilty verdict beyond a reasonable doubt and to the exclusion of every hypothesis consistent with innocence under either count.
 
 [5]
 

 ¶ 21. In response, the State argues that when viewed in its entirety, the evidence, although circumstantial, was legally sufficient to sustain convictions of murder and arson in the first degree. The State asserts that Wilson’s extrajudicial statements to law-enforcement authorities, many of which turned out to be deliberate fabrications of great degree, together with testimony and evidence
 
 aliunde
 
 the false statements, as well as the reasonable inferences to be drawn from the evidence in toto, including the DNA evidence, were sufficient to demonstrate Wilson’s guilt. We agree with the State’s analysis of the law as applied to this assignment of error.
 

 ¶22. When addressing the legal sufficiency of the evidence, this Court has provided:
 

 A (1) motion for a directed verdict, (2) request for peremptory instruction, and (3) motion for judgment notwithstanding the verdict challenge the legal sufficiency of the evidence.
 
 McClain v. State,
 
 625 So.2d 774, 778 (Miss.1993). “Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court.”
 
 McClain,
 
 625 So.2d at 778.... “If there is sufficient evidence to support a verdict of guilty, this Court will not reverse.”
 
 Meshell v. State,
 
 506 So.2d 989, 990 (Miss.1987).
 
 See also Haymond v. State,
 
 478 So.2d 297, 300 (Miss.1985);
 
 Fairley v. State,
 
 467 So.2d 894, 902 (Miss.1985). The test to be applied in considering the sufficiency of the proof based on circumstantial evidence is “whether a rational fact finder might reasonably conclude that the evidence excludes every reasonable hypothesis inconsistent with guilt of the crime charged.”
 
 Shields v. State,
 
 702 So.2d 380, 382 (Miss.1997) (citing
 
 Deloach v. State,
 
 658 So.2d 875, 876 (Miss.1995)).
 
 See also Murphy v. State,
 
 566 So.2d 1201, 1204 (Miss.1990).
 

 Hughery v. State,
 
 799 So.2d 105, 117-18 (¶ 17) (Miss.Ct.App.2001).
 

 ¶ 23. After reviewing the present case, we find that the evidence was sufficient to support the guilty verdicts.
 
 See Id.
 
 at 118 (¶ 17). The sufficiency of the evidence supporting the convictions is shown through the following evidence: Fire Marshall White testified he investigated the fire and determined the fire to be arson; Detective Kimbell testified she determined that Wilson lived in the room in Stamps’s residence that caught on fire; Detective Logan located a hammer with blood and hair on its exterior hidden behind a piano in a “junk room” at Stamps’s residence; Dr. Scales testified he performed tests on the hammer and determined the DNA
 
 *430
 
 found on the head of the hammer matched Stamps’s DNA sample, and he recovered a mixture of DNA on the hammer handle and determined there were no genetic markers in the DNA mixture that could be attributed to anyone other than the DNA from Stamps and Wilson; Dr. Li testified Stamps received multiple blunt-force injuries, and some of Stamps’s lacerations were consistent with injuries caused by a hammer; Detective Kimbell testified Wilson provided a handwritten statement that placed him at the scene of the crime; Knox, Stamps’s neighbor, testified she noticed three cars, including a tan car in the driveway next door, at 5:00 a.m. on the morning of the 23rd, but when she looked back outside at approximately 6:40 a.m. or 6:45 a.m., Stamps’s mobile home was on fire, and the tan car was gone; Wilson testified he drove a gold Buick that could also be described as champagne or brown; Parks testified Stamps told him that she confronted Wilson on the day prior to her murder regarding the money she was missing and also told him that she intended to ask Wilson to move out of the residence; and Wilson’s testimony at trial demonstrated his concern over the possibility of having his ERS revoked.
 

 ¶ 24. After considering the evidence presented at trial, we find “a rational fact finder might reasonably conclude that the evidence excludes every reasonable hypothesis inconsistent with guilt of the crime charged.”
 
 See Hughery,
 
 799 So.2d at 118 (¶ 17) (citing
 
 Shields,
 
 702 So.2d at 382). Accordingly, we find that the trial court did not err by denying Wilson’s motion for a JNOV.
 
 [6]
 
 This issue lacks merit.
 

 B. Weight of the Evidence
 

 ¶ 25. Wilson argues that the case against him is entirely circumstantial and that the verdicts are not supported by the weight of the State’s evidence. Wilson asserts that the only physical evidence linking him with Stamps’s death was 1.5 nanogram of a genetic mixture from a hammer handle found in the residence where both he and Stamps lived. Wilson also contends that the investigation of the case was incomplete. Wilson asserts that the investigation failed to submit Stamps’s fingernail clippings and floor mats for testing, and he argues that his steering wheel cover and shoes were submitted for testing but no genetic material was detected on the items. Further, Wilson asserts that there was no investigation into the person seen and heard at the neighbor’s house just before the fire.
 

 ¶ 26. In response, the State argues Wilson has failed to demonstrate the trial court abused its discretion in overruling his motion for a new trial grounded, in part, on a claim that the jury verdicts were against the overwhelming weight of the evidence. The State argues that the proof proffered in support of the charges of murder and arson was both abundant and credible, and affirmation of the jury’s verdicts would not sanction an unconscionable injustice.
 

 ¶ 27. The Mississippi Supreme Court has stated:
 

 When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only dis
 
 *431
 
 turb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.
 
 Herring v. State,
 
 691 So.2d 948, 957 (Miss.1997). We have stated that on a motion for new trial,
 

 ... The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.
 

 Amiker v. Drugs For Less, Inc.,
 
 796 So.2d 942, 947 (Miss.2000).... However, the evidence should be weighed in the light most favorable to the verdict.
 
 Herring,
 
 691 So.2d at 957. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, “unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict.”
 
 McQueen v. State,
 
 423 So.2d 800, 803 (Miss.1982). Rather ... the court simply disagrees with the jury’s resolution of the conflicting testimony.
 
 Id.
 
 This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves.
 
 Id.
 
 Instead, the proper remedy is to grant a new trial....
 

 Bush,
 
 895 So.2d at 844 (¶ 18).
 

 ¶ 28. In the present case, when reviewing the evidence previously discussed in the light most favorable to the verdict, we find that the overwhelming weight of the evidence supports the guilty verdicts.
 
 See Bush,
 
 895 So.2d at 844 (¶ 18). Furthermore, we recognize that “[i]t is within the jury’s province to determine the weight and credibility to give the evidence and to resolve all conflicts in the evidence.”
 
 Dowdle v. State,
 
 57 So.3d 32, 35 (¶ 16) (Miss.Ct.App.2011) (citation omitted). Due to the evidence and testimony presented by the State at trial, we hold that the trial court did not err by denying Wilson’s motion for a new trial, and find that this issue is without merit.
 

 II. PUBLICITY DURING TRIAL
 

 ¶ 29. During pretrial motions, the trial court gave the State permission to inform the jury that Wilson was on ERS with the MDOC because of a prior felony conviction.
 
 [7]
 
 During the trial, Wilson and the State stipulated to the jury that on the day of Stamps’s death, Wilson was on ERS from the MDOC, and if he had been found to violate the conditions of his ERS, he was then subject to being sent to prison due to the violation. The nature of the prior conviction was not disclosed to the jury.
 

 ¶ 30. A related issue arose after the jury returned its verdict. The defense counsel notified the court of the jury’s possible exposure to an article that was on the front page of the DeSoto Times Tribune on October 27, 2009, the day prior to the jury deliberations. The article reported Wilson was living with Stamps as part of the terms of his probation related to a prior child kidnapping conviction in DeSo-to County. Defense counsel requested that the jury be polled in reference to the article and moved for a mistrial. The trial court stated the following:
 

 Obviously, the jury is admonished on [sic] the beginning [of trial] not to read or see any accounts of the trial in newspapers, television, radio. The law pre
 
 *432
 
 sumes, without evidence to the contrary, that they follow those directions.
 

 Regarding this particular article, obviously, we’re not going to poll the jury every time there’s an article in the paper about what’s going on in the courtroom because that’s a large portion of the time when we have trials, certainly, of this nature. However, as I had indicated at the bench, given that the article is a front page article, which does recount information that had been, by agreement, kept away from the jury as far as the details of the underlying conviction, and noting that Mr. Wilson has now been convicted of both counts and is charged as a habitual offender, that the better safety practice would be merely to call the jurors back one by one and make sure that they have not seen that article, and I will take that step.
 

 The trial judge then questioned each juror individually about their knowledge of the newspaper article and of Wilson’s past. All but one juror denied having any knowledge of the article or on the subject. The sole juror who knew about the article, Rhonda Hart, provided the following testimony:
 

 COURT: An article ran in the DeSoto Times yesterday. There is a copy of the article. I need to know if you have seen or read that article.
 

 HART: No.
 

 COURT: Do you have any knowledge as to what Mr. Wilson had previously been in trouble for?
 

 HART: Yes.
 

 COURT: Okay. Where did you get that information?
 

 HART: Someone in my family.
 

 COURT: All right. Tell me what you know.
 

 HART: All I know is kidnapping.
 

 COURT: You say a family member told you that?
 

 HART: Yes.
 

 COURT: When did this happen?
 

 HART: Last night.
 

 COURT: Why did you not report that to the jury bailiff this morning?
 

 HART: I don’t know.
 

 COURT: Mr. Champion, questions?
 

 CHAMPION [prosecuting attorney]: Did that influence your verdict in any way in this case?
 

 HART: Not at all.
 

 CHAMPION: Were you able to be fair and impartial?
 

 HART: Yes.
 

 The trial court took the matter under advisement and proceeded with sentencing. During the hearing on Wilson’s motion for a JNOV or, in the alternative, motion for a new trial, Wilson again raised the issue of juror misconduct. In denying Wilson’s post-trial motion, the trial court stated:
 

 I believe the article came out the day before closing arguments and the deliberations. I may be — well, I believe that would have to be the case for the juror to have communicated, but I believe that to have been the case, and I believe Mr. [Stacey] Spriggs [defense counsel], who was assisting indicated that it was on the Internet the night before.
 

 I will note that certainly gave opportunity for that to have been brought to this Court’s attention at a time when the juror could have been removed when alternates were still available. I certainly do not dispute — as a matter of fact, I find and I certainly believe that Mr. [John] Watson [defense counsel] brought that to the Court’s attention as soon as he was aware of it. That doesn’t change the fact that it had been out there to the old “known or should have
 
 *433
 
 known” about the existence of the article.
 

 I will note, as I noted in chambers, that the Court probably made a mistake in the favor of the [defendant in going to quiz the jury panel without the [defendant putting forth any additional basis for the Court to believe the jury had been influenced, but as I had indicated to counsel and I’ll indicate again, I offer no apologies for that in that we discovered that a juror had in fact received extraneous information.
 

 Regarding that, each juror was called in. Eleven jurors indicated they had not read the article, did not know anything about Mr. Wilson’s past. The twelfth juror indicated she did not read the article but that she had been made aware of what Mr. Wilson’s prior conviction was for. She indicated she had not told any other jurors, which was, of course, backed up by their sworn testimony and, likewise, indicated it had not influenced her decision in the case.
 

 This is a strictly factual determination in regard to Mr. Wilson, but facts that also figure into that is that the Court had deemed that the fact that Mr. Wilson had been convicted of a crime could come before the jury as to his motive. The argument being that his alleged taking of money from the deceased and her discovering that fact that his motive was he didn’t want to go back to prison upon revocation of his post-release supervision. Therefore, the fact that Mr. Wilson had been convicted did come before the Court with permission.
 
 [8]
 

 So in that regard, first and foremost, so the record is clear, I do find that the juror receiving information about Mr. Wilson’s prior conviction is prejudicial.
 

 I know an appeals court will look at this, and my finding is any time a juror finds out information about a prior conviction that I ordered to be kept out of evidence!,] I will find that to be prejudicial for the very reason I kept it out of evidence. However, I feel that the State correctly rebutted that presumption. Mr. Champion asked the juror questions during the process. It appears clear that no other jurors had any of this information and that she was not influenced by the information.
 

 ¶ 31. The standard of review when considering a denial of a motion for a new trial is abuse of discretion.
 
 Rutland v. State,
 
 60 So.3d 137, 142 (¶ 18) (Miss.2011) (citations omitted). The Mississippi Supreme Court in
 
 Gladney v. Clarksdale Beverage Co.,
 
 625 So.2d 407 (Miss.1993), formulated a “systematic method” to be used by the trial courts to inquire into juror verdicts pursuant to Mississippi Rule of Evidence 606(b).
 
 James v. State,
 
 912 So.2d 940, 951 (¶ 18) (Miss.2005) (citations omitted). Rule 606(b) states:
 

 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon that or any other juror’s mind or emotions as influencing assent to or dissent from the verdict or indictment or concerning the juror’s mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror’s affidavit or evidence of any statement by
 
 *434
 
 the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.
 

 Gladney
 
 provides that at the beginning of the inquiry, “the trial court and opposing counsel must be made aware of any potential juror misconduct when this evidence is manifested.”
 
 Gladney,
 
 625 So.2d at 418. “Once an allegation of juror misconduct arises, then the next step is to consider whether an investigation is warranted. In order for the duty to investigate to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption in this state of jury impartiality.”
 
 Id.
 
 If the threshold showing is made, then the trial court should conduct a post-trial hearing.
 
 Id.
 
 at 419. The Mississippi Supreme Court further provided:
 

 The scope of the hearing is[,] however, limited; the proper procedure is for the judge to limit the questions asked the jurors to determine whether the communication was made and what it contained. Once it is determined that the communication was made and what the contents were, the court is then to decide whether it is reasonably possible this communication altered the verdict.
 

 Id. “Gladney
 
 offers no interpretation nor explanation which is inconsistent with, or different from [Rule] 606(b). That is to say that it would be inappropriate, and in violation of [Rule] 606(b), for any juror to be questioned with regard to whether or not the extraneous information actually altered his verdict.”
 
 James,
 
 912 So.2d at 951 (¶ 18).
 
 See also Rutland,
 
 60 So.3d at 142 (¶ 21).
 

 ¶ 32. Wilson acknowledges that the trial court followed the procedural guidance as set forth in
 
 Gladney,
 
 625 So.2d at 418-19, but he argues the trial court abused its discretion in not requiring a new trial because there is a clear possibility the juror in question was influenced by extraneous prejudicial, incorrect information. Wilson cites
 
 James,
 
 912 So.2d at 949-53 (¶¶ 17-28), in support of his argument. However, a review of the record shows that
 
 James
 
 is factually distinguishable from the case before this Court.
 

 ¶ 33. In
 
 James,
 
 Dayon James was charged in a multiple-count indictment for the murder of Shanekque Keyes and the murder of Alonso Smith in December 1995.
 
 Id.
 
 at 943 (¶ 4). During pretrial motions, the trial court granted James’s motion to sever the counts, and the State elected to try Shanekque’s case first.
 
 Id.
 
 Great efforts were expended to ensure that no one mentioned any alleged injuries to Alonso in the jury’s presence.
 
 Id.
 
 Jury selection for James’s trial began on July 8, 1996.
 
 Id.
 
 at (¶ 5). At the conclusion of the trial, James was convicted of capital murder and sentenced to life in prison.
 
 Id.
 
 at 944 (¶ 6). On the day after the trial, defense counsel was informed of the possibility that the jury had been exposed to extraneous prejudicial information.
 
 Id.
 
 at (¶ 7). A hearing was held on August 14, 1996, and Wanda Conway, a member of the venire, testified that on July 9, 1996, when the court recessed for lunch during voir dire, she went to lunch with another prospective juror and Juror Shawn Watson.
 
 Id.
 
 Conway testified that the women discussed the case during lunch, including that James was accused of murdering another child.
 
 Id.
 

 ¶ 34. Conway also testified that later that afternoon, the entire group was sent to sit in another courtroom while the trial court conducted individual voir dire, and while there, she heard many members of the venire discussing the case and that there were two children involved. Id. at 944-45 (¶ 8). Conway testified that she spoke with Watson the day after the trial
 
 *435
 
 ended, and Watson told her that some members of the jury knew about the second child and kept bringing it up in the jury room.
 
 Id.
 
 at 945 (¶ 9). Conway also testified that Watson told her that several jurors said they found James guilty because “it was two children.”
 
 Id.
 
 Lastly, Conway testified that Watson told her that while in the jury room, several jurors discussed the docket sheet that they saw posted outside the courtroom which indicated that James was charged with an additional crime.
 
 Id.
 
 After presentation of this testimony in support of its motion, defense counsel then requested that the trial court conduct further investigation into the jury’s possible exposure to extraneous information, pursuant to
 
 Gladney. Id.
 
 at (¶ 10). The trial court determined that there had not been a threshold showing that further inquiry was necessary under
 
 Gladney,
 
 and denied James’s motion.
 
 Id.
 

 ¶ 35. On appeal, we reversed and remanded the
 
 James
 
 case to the trial court, instructing the “trial court to hold a hearing for the purpose of determining whether extraneous prejudicial information was introduced into the jury’s deliberations concerning the death of the other child.”
 
 Id.
 
 at (¶ 11) (citation omitted). This Court denied the State’s motion for rehearing, withdrew the original opinion, and substituted a modified opinion.
 
 Id.
 
 at (¶ 12). James then filed a motion for rehearing, which the Court dismissed.
 
 Id.
 
 at 945-46 (¶ 12). Both the State and James then filed petitions for writ of certiorari, which the Mississippi Supreme Court denied.
 
 Id.
 
 at 946 (¶ 12). The
 
 James
 
 case was remanded to the trial court to reconvene and to poll the jury concerning its possible exposure to extraneous information.
 
 Id.
 
 at (¶ 13). Ultimately, eleven of the twelve jurors and both alternates were located and summonsed to appear in court.
 
 Id.
 
 at (¶ 14). A hearing was held on May 15, 2001, and eleven jurors and one alternate appeared to testified.
 
 Id.
 
 The trial court questioned each juror individually, refusing to allow the attorneys to question the jury.
 
 Id.
 
 at 946-49 (¶¶ 14-15). The trial court determined that extraneous information had been communicated to the jury; however, the trial court found that “this communication was incidental and that the jury verdict should not be impeached.”
 
 Id.
 
 at 949 (¶ 15). On appeal, this Court affirmed the trial court’s judgment.
 
 Id.
 
 at (¶ 16).
 

 ¶ 36. After this Court denied James’s motion for rehearing, the Mississippi Supreme Court granted James’s petition for writ of certiorari.
 
 Id.
 
 (citations omitted). The Mississippi Supreme Court ultimately determined, however, that the trial court’s failure to reconvene the jury fully for the hearing on May 15, 2001, was reversible error mandating a new trial, and the passage of time which made reconvening the jury impracticable was unfairly prejudicial to James and violated his due-process rights.
 
 Id.
 
 at 951-52 (¶¶ 20-21). Further, the supreme court found, based on the standard established in
 
 Gladney,
 
 that it was “reasonably possible that the communication altered the verdict” and that a new trial should be granted.
 
 Id.
 
 at 952 (¶ 22). In support of its finding, the supreme court in
 
 James
 
 pointed to Conway’s testimony that: Watson told her that many members of the venire discussed the allegations regarding a second child while waiting in the separate courtroom; Watson told her after the trial that some members of the jury knew about the second child and kept bringing it up in the jury room; and Watson indicated that the docket sheet supported the allegation that a second child was involved.
 
 Id.
 
 at 952 (¶¶ 22-24). Additionally, the supreme court found in
 
 James
 
 that during the May 2001 hearing, several of the jurors admit
 
 *436
 
 ted knowledge of the fact that James was accused of killing a second child.
 
 Id.
 
 at 952-53 (¶¶ 24-26). Finally, the supreme court held that the trial court erred when it refused to allow the attorneys to examine the jurors during the May 2001 hearing.
 
 Id.
 
 at 953 (¶ 28).
 

 ¶37. In this case, contrary to
 
 James,
 
 the record shows that only one juror, Hart, admitted to having knowledge of the newspaper article and admitted having been made aware of Wilson’s prior conviction. Further, in this case, contrary to
 
 James,
 
 the record indicates that Hart did not discuss her knowledge of this information with any of the other jurors and that she possessed no knowledge of the details of Wilson’s past conviction, as evidenced by the testimony of the other eleven jurors that they did not have any knowledge of the newspaper article or of Wilson’s past. Moreover, as the trial judge acknowledged, the jury had already been informed of Wilson’s ERS status by stipulation between Wilson and the State, and Wilson testified as to his ERS status as his basis for initially providing false information to law-enforcement officers as to his whereabouts.
 

 ¶ 38. The record in the present case further indicates that defense counsel notified the court of the newspaper article the day after the article was published. The record further shows that after being notified by defense counsel of the possibility of the jury’s exposure to the newspaper article, the trial court interviewed each of the twelve jurors as to their knowledge of the extraneous information. After questioning the jurors, the trial court determined that while it was prejudicial for Hart, a juror, to learn of Wilson’s prior conviction, which had been specifically kept out of evidence, the State correctly rebutted the prejudicial presumption. After reviewing the record, we cannot find that the trial court abused its discretion in making this determination. Therefore, we hold the trial court did not err in denying Wilson’s motion for a new trial.
 
 See Rutland,
 
 60 So.3d at 145 (¶ 33) (citing
 
 Gladney,
 
 625 So.2d at 415) (“This Court’s authority to reverse a trial court’s ruling on a motion for new trial is limited to those instances when the trial court abuses that discretion.”). This issue lacks merit.
 

 III. PRIOR CONVICTION EVIDENCE
 

 ¶ 39. During the pretrial hearing, the State sought the trial court’s permission under Mississippi Rules of Evidence 404(b) and 403 to use Wilson’s ERS status as proof of motive for Stamps’s murder and the arson of Stamps’s residence. The trial court found the evidence of Wilson’s ERS status to be relevant and admissible, finding that the evidence was more probative than prejudicial. However, the trial court ruled that the State would only be allowed to establish that Wilson was on ERS status and put forth evidence that the possible revocation of his ERS status constituted his motive for the underlying offenses. The trial court found, however, no necessity existed to go into great detail as to the crimes for which Wilson was previously convicted. During the trial, the State and Wilson stipulated that Wilson was on ERS from the MDOC on the day of the victim’s death, and if Wilson had been found to have violated the conditions of his ERS, he would have been subject to being sent to prison.
 

 ¶ 40. On appeal, Wilson argues that the trial court erred in allowing the State to use his prior conviction and ERS status against him in its case-in-chief. Specifically, Wilson contends it was not necessary to introduce evidence that Wilson was on supervised release with MDOC for the State to present its case to the jury, arguing that
 
 *437
 
 the State is not required to prove motive in a murder case.
 
 See Roberts v. State,
 
 458 So.2d 719, 722 (Miss.1984). Wilson also argues that there was no evidence that Stamps ever intended on going to the police with the allegation about stolen money. Further, Wilson contends that while proof of another crime or act may be admissible where the other crime or act is so interrelated to the charged crime as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences, in this case, there was no probative connection between Wilson’s ERS status and Stamps’s death; thus, the evidence was inadmissible.
 
 See Townsend v. State,
 
 681 So.2d 497, 506 (Miss.1996).
 

 ¶ 41. In response, the State argues that the trial court did not abuse its discretion in permitting the State to introduce evidence of Wilson’s prior conviction and Wilson’s then existing status as a free man by virtue of his ERS. The State contends such was admissible to demonstrate motive for the killing of Stamps and the burning of her home.
 
 See Carter v. State,
 
 953 So.2d 224, 229-33 (¶¶ 11-21) (Miss.2007);
 
 Mayers v. State,
 
 42 So.3d 33, 42-43 (¶¶ 32-37) (Miss.Ct.App.2010) (finding that the trial court abused no discretion in allowing evidence of Mayers’s prior convictions to prove motive under Rule 404(b));
 
 Gales v. State,
 
 29 So.3d 65, 77-79 (¶¶ 41-48) (Miss.Ct.App.2009) (affirming the trial court’s decision to allow evidence of Gale’s prior convictions into evidence to prove knowledge and intent under Rules 404(b) and 403);
 
 Bone v. State,
 
 914 So.2d 209, 213-14 (¶¶ 14-20) (Miss.Ct.App.2005) (finding that the trial court did not err in admitting the evidence of Bone’s prior conviction to show knowledge under Rule 404(b)). The State contends even if the testimony assailed here suggests proof of another crime, wrong, or act, it is well settled that proof of other crimes is admissible “if it sheds light upon the motive for the commission of the crime charged in the indictment.”
 
 Gardner v. State,
 
 368 So.2d 245, 248 (Miss.1979). The State also argues that in addition to proof of motive, the testimony was necessary in order to present the jury with the complete story of the crime charged.
 

 ¶ 42. “[T]his Court has held ‘that the admission of evidence is well within the sound discretion of the trial court, subject to reversal on appeal only if there be an abuse of that discretion.’”
 
 Pitchford v. State,
 
 45 So.3d 216, 246 (¶ 127) (Miss.2010). In
 
 Pitchford,
 
 45 So.3d at 245-46 (¶¶ 121-128), the Mississippi Supreme Court spoke to the issue of the admissibility of evidence concerning prior bad acts. The supreme court found that the two evidentiary rules at issue when determining whether to admit the evidence are Mississippi Rules of Evidence 404(b)
 
 [9]
 
 and 403.
 
 [10]
 

 Id.
 
 at 245-46 (¶ 124). In this case, the trial court properly considered both rules in the admission of this evidence.
 

 ¶ 43. After a thorough review of the record, we find no abuse of discretion by the trial court in admitting evidence of Wilson’s ERS status. In making its find-
 
 *438
 
 mgs, the trial court considered Mississippi Rule of Evidence 403 and found the evidence relevant to motive and more probative than prejudicial.
 

 ¶ 44. Since a review of the record shows that the trial court found the evidence to be admissible to show motive, and it found the evidence to be more probative than prejudicial, we review the trial court’s admission of this evidence for abuse of discretion.
 
 Pitchford,
 
 45 So.3d at 246 (¶ 128). Therefore, we find that the trial court did not abuse its discretion in finding the evidence to be admissible. This assignment of error is without merit.
 

 IV. HEARSAY
 

 ¶ 45. During the pretrial hearing, Wilson sought to prevent the State from using certain statements that Stamps allegedly made to her boyfriend, Parks, on the day and evening before she died, concerning Stamps’s belief that Wilson had stolen money from her; she had confronted him about the missing money; and she intended to ask him to move out of the residence. The trial court deemed the statements admissible and stated that the statements would be admissible to the extent that they would show the victim’s state of mind as to intent, but the court determined that admission under the residual hearsay exception was more applicable in accord with Mississippi Rule of Evidence 804(b)(5) under the same criterion as the Rule 803 residual clause. The trial judge stated:
 

 I think the evidence does come in under the residual clause under 804[ (b) ](5), under the same criteria that would be under the 803 residual clause, and as required, let me go through that criteria as I’m required to address each and every element. I am citing from
 
 Randall versus State,
 
 806 So.2d 185 [ (Miss.2001) ].
 

 I will note that the requirements are the adverse party must have notice of the intended use. We took that up at the beginning of the hearing. Obviously, we are here almost a week before the trial. Obviously, the intended — bringing forth of these statements was made aware to counsel last week when we were finishing up other hearings, and I feel that Mr. Wilson has notice of the intended use of the statements.
 

 The statements must have circumstantial guarantees of trustworthiness: I will note in this regard the statements apparently were made to a boyfriend who, at least has been presented to this Court, has no reason to lie that has been presented to this Court. Let’s start with that evaluation. In that regard, also, the witness to whom the statements were made supposedly is the one that was involved in giving the money to the deceased and then wiring additional money that I think, at least, had some peripheral involvement in this. Therefore, he would have had knowledge of the facts that surround the statements that were made by the deceased to him regarding the money and regarding the decision to confront Mr. Wilson. I find that there are circumstantial guarantees of trustworthiness that would meet the required satisfaction it fell into one of the other exceptions to the hearsay rule. No. 3, it must be offered as evidence of a material fact. I think that is clearly covered, but I will state on the record that the statement that she was going to confront Mr. Wilson and then, I believe, another statement that she was going to confront him again and kick him out goes directly to Mr. Wilson’s motive, especially when combined with Mr. Wilson’s later statements on the issue of the revocation. I think that it is obviously a material fact as to Mr. Wilson’s motive in that regard.
 

 
 *439
 
 No. 4, it must be more probative than any other evidence. At this point, I’ve been presented no other evidence, other than Mr. Wilson’s statements during his interview. The only evidence that would be probative in addition that I’ve been presented would be the knowledge that the boyfriend would have in regard to the money and the involvement with the deceased. Other than that, it would be the statement. So it is certainly more probative than any other evidence as there is very limited evidence otherwise.
 

 And [n]o. 5, the purpose of the rules in the interest of justice must be served by admitting the statement. Obviously, to the extent Mr. Wilson’s rights can be protected, which in this regard, I am required to evaluate it in that manner. In that regard, the State certainly is entitled to present [its] motive or [its] claimed motive as to why Mr. Wilson would have allegedly committed this crime. [The State] would not, as a general rule, with certain exceptions, be required to present that this just happened without giving any reason, and I think that meets the purpose of the rules and the interest of justice. Noting, once again, that the safeguards the Court will have in place to make sure that the details are not gone into to the extent that the jury would for some reason convict Mr. Wilson because of some prior wrongdoing rather than what he is alleged to have done in this particular circumstance.
 

 Certainly, in addition, if the [djefense requests, at the appropriate time, the Court would be giving a limiting instruction directing them that they could only consider that evidence for the purpose of motive and not for the purpose of determining that Mr. Wilson might somehow be a bad person or convicting him because of some prior run-ins with the law.
 

 The trial court again addressed the issue of Stamps’s statements to Parks during the trial. The trial court acknowledged that the State argued that the statements were relevant and admissible in accordance with Mississippi Rule of Evidence 803 pertaining to statements as to state of mind. The trial court found that the statements fell within that exception, stating:
 

 I will note, first and foremost, as I indicated then, this does fall within that exception and a circumstance where the availability of a witness is not material. I will note citing
 
 Dendy versus State,
 
 D-E-N-D-Y, 931 So.2d 608 [ (Miss.2005) ], that such statements are admissible where they’re more probative on the point for which they were offered than other evidence which the proponent could procure through reasonable efforts, that they had a high degree [of] trustworthiness, and the defense was given reasonable notice.
 

 I certainly note we have had a whole hearing on these issues so the [d]efense has certainly had notice. For the reasons previously stated, they are the only evidence which could be procured regarding these issues that go toward [ ] potential motive, and I find that they are trustworthy in that, certainly, Mr. Parks has testified regarding the statements, and they would match up as best possible with the remaining facts in the case.
 

 The trial court found that Rule 804(b)(5) constituted an additional basis for admission as follows:
 

 As I had indicated, I think that Rule 804[ (b) ](5) is the closer on point and more applicable, and so I will cite
 
 Randall versus State,
 
 806 So.2d 185. Some of the same requirements in the residual exception, but I will note that the [defendant has had notice of the intended use. For the reasons just stated, there are circumstantial guarantees
 
 *440
 
 of trustworthiness. Certainly, No. 3, it’s offered as evidence of a material fact, that being motive that would be alleged in this case. It’s more probative than other evidence, and as I indicated, there is no other evidence on this particular issue, and that the purpose of the rules, in the interests of justice, must be served by admitting the statement.
 

 I would note that there’s no abuse of that rule in this case by the State. They’re not trying to put forth anything other than the money missing, the decedent’s suspicion that the [djefendant may have stolen it, and her intent to confront him regarding moving out in that regard. For those reasons, I had previously found, but I would note for the record that they are admissible in that regard.
 

 The record shows that a limiting instruction was requested by the defense and then given by the court prior to the jury deliberations.
 

 ¶ 46. On appeal, Wilson argues that the trial court erred because Parks’s testimony, as to his conversations with Stamps, constituted hearsay which was more prejudicial than probative of material issues. While Wilson acknowledges that testimony of “other crimes, evidence, or testimony” which may be otherwise excludable, may be introduced “in order to tell a rational and coherent story of what happened and where it is substantially necessary to present a complete story,
 
 Mackbee v. State,
 
 575 So.2d 16, 27-28 (Miss.1990), he asserts that there was no need to introduce the State’s motive theory through second-hand accusations to tell a coherent story. Further, Wilson argues that the trial court erroneously relied on
 
 Dendy v. State,
 
 931 So.2d 608 (Miss.Ct.App.2005) and
 
 Randall v. State,
 
 806 So.2d 185 (Miss.2001) in determining that the testimony fell under the hearsay exceptions of Mississippi Rules of Evidence 803(3) and 804(b)(5).
 

 ¶ 47. Wilson argues that
 
 Dendy
 
 is factually distinguishable from this case and that
 
 Randall
 
 actually supports his position that the testimony should have been excluded. In response, the State concurs that the statements were hearsay, but he contends they were admissible as an exception to the hearsay rule. The State argues that no abuse of judicial discretion occurred in the present case since the trial court applied the correct legal standard in evaluating the admissibility of Stamps’s hearsay statements to Parks hours prior to her murder.
 

 ¶ 48. Before proceeding with our discussion, we must first note that the standard of review for the admission of evidence is abuse of discretion.
 
 Anderson v. State,
 
 62 So.3d 927, 933 (¶ 13) (Miss.2011) (citations omitted).
 

 A. Mississippi Rule of Evidence 803(3)
 

 ¶ 49. Wilson argues that
 
 Dendy
 
 is factually distinguishable from today’s case. Specifically, Wilson argues that while the
 
 Dendy
 
 court found the murder victim’s statements to be admissible under Rule 803(3), the court in
 
 Dendy
 
 had another reason to introduce the statement, namely the hearsay evidence rebutted previous testimony.
 
 Dendy,
 
 931 So.2d at 614 (¶¶ 20-23). Wilson argues, in this case, the objectionable testimony rebutted nothing, and it was merely assertive and accusatory.
 

 ¶ 50. After reviewing the record, we disagree with Wilson’s assertion and find
 
 Dendy to
 
 be directly on point with
 
 today’s
 
 case. In
 
 Dendy,
 
 this Court stated:
 

 “[T]he admissibility of testimonial evidence is left to the sound discretion of the trial court within the boundaries of
 
 *441
 
 the Mississippi Rules of Evidence, and it will not be found in error unless it is has abused its discretion.”
 
 Harris v. State,
 
 861 So.2d 1008, 1018 (¶ 41) (Miss.2003). Furthermore, the Mississippi Supreme Court has held that a relevant statement made by a murder victim prior to his death may be admissible as an exception to the hearsay rule under the declarant’s then-existing mental condition, or state of mind exception under [Rule] 808(3).
 
 Brown v. State,
 
 890 So.2d 901, 914-15 (¶¶ 42-46) (Miss.2004);
 
 Harris,
 
 861 So.2d at 1019 (¶ 42).
 

 Dendy,
 
 931 So.2d at 614 (¶ 21).
 

 ¶ 51. As in
 
 Dendy,
 
 the trial court in this case gave on-the-record findings, stating “we have had a whole hearing on these issues so the [djefense has certainly had notice. For the reasons previously stated, [the statements] are the only evidence which could be procured regarding these issues that go toward[] potential motive, and I find that they are trustworthy in that, certainly, Mr. Parks has testified regarding the statements, and they would match up as best possible with the remaining facts in the case.” Based on these findings and the cited case law,
 
 [11]
 
 we find the trial court did not abuse its discretion in allowing the statements into evidence as evidence of motive. This issue lacks merit.
 

 B. Mississippi Rule of Evidence 804(b)(5) — Residual Hearsay Exception
 

 ¶ 52. With respect to a statement not covered specifically by other exceptions, Rule 804(b)(5) sets forth the eviden-tiary requirements for admitting evidence pursuant to the residual hearsay exception. The Mississippi Supreme Court has stated that five conditions must be met before evidence is admissible under Mississippi Rule of Evidence 804(b)(5): “(1) [t]he adverse party must have notice of intended use; (2)[t]he statement must have circumstantial guarantees of trustworthiness; (3)[i]t must be offered as evidence of a material fact; (4)[i]t must be more probative than other evidence; and (5)[t]he purpose of the rules and the interests of justice must be best served by admitting the statement.”
 
 Randall,
 
 806 So.2d at 201 (¶ 24) (quoting
 
 Butler v. State,
 
 702 So.2d 125, 128 (Miss.1997)). Furthermore, the supreme court stated that the five requirements are conjunctive; therefore, each must be met before hearsay may properly be found admissible.
 
 Id.
 

 ¶ 53. Wilson acknowledges that the unavailability of the declarant was not at issue at trial because Stamps was deceased. Wilson further concedes that his trial counsel received notice of the State’s intent to use the testimony. Wilson argues, however, that the trial court’s findings as to the trustworthiness and probative value of the testimony was in error, and the “interests of justice” require that the unchallenged hearsay not involve the accusation of another crime. Wilson contends “the victim’s statements were not needed nor reliable, but if admissible, only to the degree that there had been a possible disagreement between Stamps and Wilson and Ms. Stamps’[s] intending on asking him to leave under [Rule] 803(3).” We disagree.
 

 ¶ 54. A review of the record shows that the trial court carefully analyzed all of the requirements to satisfy admission of evidence in accordance with Rule 804(b)(5) of Stamps’s statements. The trial judge provided thorough on-the-record findings for each requirement of Rule 804(b)(5) show
 
 *442
 
 ing equivalent guarantees of trustworthiness. After reviewing the record, we find no evidence to support Wilson’s claim that the trial court abused its discretion in finding Parks’s testimony as to the statements made by Stamps to him on the day prior to her death to be admissible. Accordingly, we find that this assignment of error is without merit.
 

 ¶ 55. THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY OF CONVICTION OF COUNT I, MURDER, AND SENTENCE OF LIFE, AND COUNT II, ARSON IN THE FIRST DEGREE, AND SENTENCE OF TWENTY YEARS, ALL AS A HABITUAL OFFENDER IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION, WITH THE SENTENCE IN COUNT II TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO DESOTO COUNTY.
 

 LEE, C.J., IRVING, P.J., MYERS, ISHEE, ROBERTS AND RUSSELL, JJ., CONCUR. GRIFFIS, P.J., BARNES AND MAXWELL, JJ., CONCUR IN PART AND IN THE RESULT.
 

 [1]
 

 . On redirect examination, Parks clarified this statement and explained that Stamps told him during his conversations with her on September 22, 2008, that she had already confronted Wilson about the missing money, and he had denied taking it, but she had not asked him to leave yet.
 

 [2]
 

 . Wilson testified that Stamps was his third cousin, but he referred to her as "Aunt Jho.”
 

 [3]
 

 . Wilson also testified that the color of his vehicle could be described as champagne or brown.
 

 [4]
 

 . Wilson argues that the State's following facts failed to establish facts upon which he could be convicted: Stamps was a victim of a homicide; Stamps’s residence was set on fire; Wilson lived with Stamps and was accused of stealing money from her; Wilson's car was in the driveway more than an hour before the fire was detected; Wilson’s car was gone when the fire was detected, and he was in Memphis the rest of the day; Wilson’s and Stamps’s DNA was found on the hammer, which was apparently the murder weapon.
 

 [5]
 

 . Specifically, Wilson asserts that not only is there a reasonable hypothesis consistent with his innocence, but actual eyewitness testimony exists to show that a person was seen running from the crime scene the time Wilson was in Memphis, Tennessee.
 

 [6]
 

 . As previously stated, a motion for a directed verdict and a motion for a JNOV challenge the legal sufficiency of the evidence.
 
 Hughery,
 
 799 So.2d at 117-18 (¶ 17) (citing
 
 McClain v. State,
 
 625 So.2d at 778). “Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court.”
 
 Id.
 
 at 118 (¶ 17). Therefore, in the present case, we will review Wilson's JNOV motion because it was the last occasion that the challenge was made in the trial court.
 

 [7]
 

 . Wilson testified at trial that he had lied in his previous statement to law enforcement as to his whereabouts on the day of the murder because he was in Memphis in violation of his ERS.
 

 [8]
 

 . The trial judge referred herein to the stipulation between Wilson and the State as to his ERS status at the time of the offenses.
 

 [9]
 

 . Rule 404(b) provides:
 

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 

 [10]
 

 . Rule 403 states:
 

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 

 [11]
 

 .
 
 See Hall v. State,
 
 39 So.3d 981, 984 (¶¶ 10-12) (Miss.Ct.App.2010) ("Rule 803(3) has been held to encompass relevant statements made by victims prior to their death.”);
 
 Bogan v. State,
 
 754 So.2d 1289, 1293-94 (¶¶ 14-16) (Miss.Ct.App.2000).